# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# MIDLAND-ODESSA DIVISION

| | |
|---|---|
| FINALROD IP, LLC, and R2R AND D, LLC d/b/a SUPEROD,<br><br>*Plaintiffs/Counterclaim Defendants*<br><br>v.<br><br>JOHN CRANE, INC., JOHN CRANE PRODUCTION SOLUTIONS, INC. and ENDURANCE LIFT SOLUTIONS INC.,<br><br>*Defendants/Counterclaim Plaintiffs*. | Case No.: 15-CV-00097-ADA |

# DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF CHRIS HETMANIAK

## INTRODUCTION

There are few areas of agreement among the parties in this case. One area of agreement, however, is that the only reliable and scientifically-acceptable way to measure the compressive forces within a sucker rod's end fitting is to perform a Finite Element Analysis ("FEA"). Given that every one of Plaintiffs' asserted patent claims require compressive forces to be greatest at the end fitting's closed end, this is a critical issue, and both experts agree that an FEA is necessary to assess where the forces are applied to the end fitting.

Notably, however, Mr. Hetmaniak **did not run** an FEA on the accused Series 300 product, and there is **no evidence in the record** regarding FEA results for the Series 300. This fact alone renders Mr. Hetmaniak's infringement opinions regarding the Series 300 baseless, unreliable and lacking in any indicia of scientific evidence. Accordingly, he should not be allowed to opine on infringement issues concerning the compressive forces within the Series 300 product.

Moreover, Mr. Hetmaniak testified that he wanted to run an FEA on the Series 300. He even asked Plaintiffs and their counsel for permission to do so. But they **instructed him not to run an FEA**. Thus, at best, Mr. Hetmaniak's opinions fail to meet the requirements of *Daubert* and Rule 702 of the Federal Rules of Evidence ("Rule 702"); at worst, the failure to conduct an FEA demonstrates a willful disregard as to this case-dispositive issue.

The fatal problems with Mr. Hetmaniak's opinions, which compel their exclusion, do not end there. Over and over again, Mr. Hetmaniak's analysis is conclusory, lacks ties to the facts of this case, and does not rely upon a scientific basis. For example, Mr. Hetmaniak asserts that the accused Series 200 and 300 meet the claim element of compensating for back pressure in the sucker rod, but he admittedly *never performed* the FEA he said was required assess the effect of back pressure on either product. Mr. Hetmaniak also claims that the wedge configurations in the accused devices would "define" the distribution of force in the wedge portion, but he offers no

1

data or other evidence to support his view. And, he contends that the accused devices have particular geometric features required in the claims; incredibly, however, he never bothered to measure the devices to assess those features.

Over and over during his deposition, Mr. Hetmaniak conceded that he did not apply the same rigor in this case that he would have applied in his work as an engineer. Indeed, in many instances, when questioned about end fittings involved in this case, the best answers Mr. Hetmaniak could must were "I couldn't tell you," and "I don't know."

Mr. Hetmaniak's unreliable and baseless opinions do not come close to satisfying the standards of *Daubert* and Rule 702. Accordingly, the Court should exclude Mr. Hetmaniak's opinions and testimony on these issues.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs have asserted infringement of U.S. Patent Nos. 9,045,951 ("the '951 patent") and 9,181,757 ("the '757 patent). The products accused of infringing these patents are end fittings for sucker rods used in oil wells. *See* Ex. A ('951 patent) and Ex. B. ('757 patent).[1] Specifically, Plaintiffs allege that Defendants' Series 200 and 300 end fittings infringe claims 7, 8, 21 22 and 35 of the '951 patent and claims 32,33, 36 and 77 of the '757 patent.[2] Dkt. 285.

Depicted below are images of the accused Series 200 end fitting (top image) and Series 300 end fittings (bottom image). *See* Ex. C at 20; Ex. E at Ex. G, p. 3. As can be seen, the two designs are significantly different. The Series 200 is a four wedge design, whereas the Series 300 has twelve wedges. Because of the difference in the number of wedges, the lengths and depths of

---

[1] Unless otherwise stated, all citations to exhibits are to exhibits to the Declaration of Steven Lubezny filed concurrently herewith.
[2] Plaintiffs originally asserted claims 7, 8, 14, 15, 17, 21, 22, 35 and 47 of the '951 patent and claims 1, 2, 7, 8, 9, 11, 13, 15, 16, 32-36, 49, 53, 54, 55, 56, 57, and 77 of the '757 patent. Pursuant to the Court's scheduling order (Dkt. 281), Plaintiffs narrowed the asserted claims to claims 7, 8, 21, 22 and 35 of the '951 patent and claims 32, 33, 36 and 77 of the '757 patent. Dkt 285.

2

the wedges in the Series 300 are generally smaller than in the Series 200.



Plaintiffs' technical expert, Mr. Hetmaniak, has proffered three reports on the issue of infringement. On August 10, 2018, he submitted a report providing his opinions regarding infringement of the Series 200 device. *See* Ex. C. He supplemented his opinion on the Series 200 with a report dated December 3, 2018. *See* Ex. D. Mr. Hetmaniak provided a third report concerning infringement of the Series 300 end fitting on February 22, 2019. *See* Ex. E.

Mr. Hetmaniak was deposed on August 18, 2019. As set forth in detail below, Mr. Hetmaniak's testimony made clear that, on numerous issues, he failed to conduct the requisite, standard testing and analysis of the accused products. Accordingly, pursuant to the Court's scheduling order (Dkt. 281), Defendants now file this motion to exclude portions of Mr. Hetmaniak's reports and opinions.

3

**ARGUMENT**

A.   **Expert Testimony is Only Admissible if Reliable and Relevant**

The admissibility of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has held that, because expert witness testimony has the potential to "be both powerful and quite misleading," the district court must act as a gatekeeper to "ensur[e] that an expert's testimony ***both rests on a reliable foundation and is relevant to the task at hand***." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595, 597 (1993) (emphasis added) (citations omitted); *Elder v. Tanner*, 205 F.R.D. 190, 194 (E.D. Tex. 2001).

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). The "first and most significant *Daubert* factor is whether the proffered opinions has been subjected to the scientific method." *Cummins v. Lyle Indus*, 93 F.3d 362, 368 (7th Cir. 1996). Consequently, expert opinions that do not rely on valid scientific principles, that do not rely on accurate date, or that do not correctly apply those scientific principles to the relevant data should be excluded. *See MGM Well Servs., Inc. v. Mega Lift Sys*., LLC, No. CIV.A. H-05-1634, 2007 WL 150606, at *2 (S.D. Tex. Jan. 16, 2007); *Hathaway v. Bazany*, 507 F.3d 312, 318

4

(5th Cir. 2007) ("[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory.").

Conclusory opinions "without any elaboration or reasoning" should likewise be excluded as they "will not assist the trier of fact." *Elder*, 205 F.R.D. at 193-194. "It is not sufficient simply to list the resources [the expert] utilized and then state an ultimate opinion without some discussion of their thought process." *Id.* at 194. That is the case presented here.

**B.     The Court Should Exclude Mr. Hetmaniak's Opinion That The Series 300 End Fitting Has "Compressive Forces" Greatest At The Closed End**

**1.     Mr. Hetmaniak Confirmed that the Proper Way to Assess the "Compressive Forces" Limitations is to Run an FEA On The Accused Device**

Every asserted claim in the '951 and '757 patents requires the end fittings to function in a particular manner: *i.e.* during use, the "compressive forces" must be ***greatest at the wedge closest to the closed end*** and lowest at the wedge portion at the open end. For example, the asserted '757 claims require that "compressive forces create a force differential along the wedge system ***greater at the closed end of the fitting*** and decreasing toward the open end of the fitting" or that "compressive forces [create a force differential along the wedge system] ***greater at the closed end of the fitting*** and decreasing toward the open end of the fitting." *See* Ex. B ('757 Patent) at claims 32 and 77. Likewise, the asserted '951 claims require that the "compressive forces applied to the sucker rod at the ***closed end of the body exceed*** compressive forces [in the sucker rod] at the open end of the body." *See* Ex. A ('951 Patent) at claims 7 and 21.

As explained in Defendants' concurrently filed summary judgment brief, Mr. Hetmaniak's own testimony confirms that one cannot ascertain the compressive forces that the end fitting will experience during operation (including the location within the end fitting that the compressive forces are greatest) simply by looking at an end fitting's design. Ex. F (Hetmaniak Dep.) at 21:25-22:24; *see also id.* at 35:13-22, 49:16-51:4, 69:9-70:7. Thus, Mr. Hetmaniak testified, to "truly

5

understand how an end fitting performs under load … an FEA is warranted." *Id.* at 22:13-15.

The parties' technical experts agree that an FEA is a computerized mathematic simulation that engineers have for years routinely relied upon to model and understand the forces that apply to real physical structures. *Id.* at 11:1-23; *see also* Ex. G (Crichlow Suppl. Invalidity Report ) at ¶ 6. Leaving no doubt as to the importance of an FEA, Mr. Hetmaniak testified that to assess whether an end fitting practiced the claims of the '951 and '757 patents, the "correct thing to do" is to "run the finite element analysis on the actual product with the right geometries." Ex. F (Hetmaniak Dep.) at 22:22-24.

### 2. Mr. Hetmaniak Never Performed Or Reviewed an FEA for the Series 300 End Fitting, And There Is N*o Evidence Regarding FEA Results for that End Fitting*

In his February 22, 2019 report, Mr. Hetmaniak opined that Defendants' Series 300 end fitting practices the "compressive forces" limitations. Ex. E at 20-27. In so opining, Mr. Hetmaniak relied exclusively upon an FEA analysis performed by John Crane in 2016, which Mr. Hetmaniak claimed in his report was for the Series 300 device. *Id.* at 20 ("I was provided finite element analysis (FEA) results conducted by JCPS on what I understand to be their Series 300 end fitting."). Mr. Hetmaniak was totally wrong, however.

Indeed, the 2016 FEA did not involve the Series 300 product, and the wedge design and geometry of what was analyzed in 2016 ***did not match*** the Series 300 product that is at issue in this case. Mr. Hetmaniak admitted as much at his deposition. Specifically, he testified that the wedge angles of the end fitting in the 2016 FEA were different than the Series 300. Ex. F at 95:1-24. He also acknowledged that the end fitting analyzed in the 2016 FEA had different wedge shapes than the Series 300. *Id.* at 98:11-19. As such, Mr. Hetmaniak conceded that "the wedge design that was in the FEA that [he] looked at was ***not the same as the Series 300 product.***" *Id.*

at 95:25-96:4.³

In fact, at his deposition, Mr. Hetmaniak made the extraordinary admission that he knew that the end fitting analyzed in the 2016 FEA did not represent the Series 300 device *when he wrote his report*. *Id.* at 95:25-96:24. He understood that the "correct thing to do" would have been to "run the finite element analysis on the actual product with the right geometries," *id.* at 22:22-24, yet he *never did so*. He had the capability to run his own FEA for the Series 300. *See* Ex. D (Hetmaniak Suppl. Infringement Report) at 3 (explaining that Mr. Hetmaniak's firm had a license to use FEA software). Why, then, did Mr. Hetmaniak not run a FEA for the Series 300? Because when he asked Plaintiffs for permission to run an FEA on the Series 300, **Plaintiff instructed him not to run the FEA**. Ex. F at 143:5-20. Mr. Hetmaniak testified:

> THE WITNESS: I don't know that I recall a lot of the specifics. It was about once we were kind of getting into the FEAs and looking at, kind of, you know -- we wanted to understand, you know, if we were going to be doing some modeling, you know, what would he want us to do and that sort of thing.
>
> Q. (BY MR. LUBEZNY) And what did [Plaintiffs' principal Russell Rutledge] want you to do?
>
> A. Nothing. He didn't want us to have to run FEAs.
>
> Q. He didn't want you to run FEAs?
>
> A. That's correct.
>
> Q. Okay. Did he explain why?

---

³ For avoidance of doubt, Defendants' expert, Dr. Crichlow, confirms that "the 2016 FEA results upon which Mr. Hetmaniak based his opinions were not related to the Series 300 device." Ex H (Crichlow Suppl. Non-Infringement Report) at ¶ 25. As Dr. Crichlow explained, a simple comparison of the two designs showed that the "end fitting corresponding to the 2016 FEA results does not illustrate the physical attributes to the Series 300 end fitting." *Id.* at ¶ 30. This is because the end fitting analyzed in the 2016 FEA had different wedge angles, different progression in changes of the angles, and different shaped wedges than the accused Series 300 products. *Id.* at ¶¶ 25-32. Indeed, between the two different designs, there was "over a 10% difference in the rate of change at the wedges towards the open end, and an 82.62% difference in the rate of change for the wedge at the closed end." *Id.* at ¶ 30.

> A.· ·It just wasn't what he wanted to pursue at the time.  I don't know anything beyond that.
>
> Q.· ·Okay.· You didn't ask him why?
>
> A.· ·No.· That's what he said and so, that's what I did --·or what I didn't do.

*Id.*

Accordingly, by Mr. Hetmaniak's own admission, his analysis regarding the "compressive forces" in the Series 300 device lacks support in fact or science.  Mr. Hetmaniak admitted, as would any engineer in this field, that one cannot reliably assess the distribution of compressive forces in the Series 300 without analyzing an FEA on that specific product.  Ex. F at 35:13-22, 49:16-51:4, 69:9-70:7.  As Mr. Hetmaniak never analyzed an FEA of the Series 300, that admission alone requires the preclusion of his opinion regarding the Series 300 product.  *See, e.g. Izumi Prod. Co. v. Koninklijke Philips Elecs. N.V.,* 140 F. App'x 236, 244 (Fed. Cir. 2005) (affirming exclusion of testimony regarding infringement under the doctrine of equivalence that "was missing the essential analysis as to whether [blades] having the same physical dimensions and operating parameters of the accused products" met the limitations and "without this minimal testing" his "subjective beliefs" were unreliable); *Thermapure, Inc. v. RXHEAT, LLC*, 35 F. Supp. 3d 968, 982-984 (N.D. Ill. 2014), *on reconsideration on other grounds*, No. 10 C 8157, 2015 WL 110075 (N.D. Ill. Jan. 7, 2015*)* (excluding expert testimony because expert did "not recall ever using or testing" the accused products); *D & D Grp. Pty Ltd. v. Nationwide Indus., Inc*., No. 08 CV 0236 MMA (POR), 2010 WL 11508568, at *6  ("In the absence of any testing on the competing devices, Dr. Rice's proposed evaluation of the strength and relative load bearing abilities of the Accused Products and the '100 Patent is not adequately supported); *Ab v. Sekendur*, No. 03 C 4723, 2004 WL 2434220, at *6 n.8 (N.D. Ill. Oct. 28, 2004) (excluding opinions as unreliable when "the expert testified that he never tested any accused of the products" and opinions in declaration contradicted

8

prior testimony); *see infra* Section C (collecting additional cases requiring testing).

Accordingly, Mr. Hetmaniak's opinions regarding whether the Series 300 practices the "compressive forces" limitations are unfounded, unreliable, irrelevant and should be excluded.

### C. The Court Should Exclude Mr. Hetmaniak's Opinion That The Accused Series 200 and Series 300 Devices "Compensat[e] For The Back Pressure Associated With The Sucker Rod"

Claim 77 of the '757 patent requires that the lengths of the end fitting's trailing edges are designed to "compensate[e] for the back pressure associated with the sucker rod in the end fitting." Ex. B at claim 77. In particular, claim 77 recites the following:

> wherein the first trailing edge is shorter than the second trailing edge and the second trailing edge is shorter than the third trailing edge, thereby compensating for the back pressure associated with the sucker rod in the end fitting

Mr. Hetmaniak testified that the way to assess whether the accused products meet this limitation is to perform the appropriate FEA. As explained below, he never did.

Mr. Hetmaniak explained that the "back pressure" referred to in claim 77 does not occur under normal operating conditions. Ex. C (Hetmaniak Infringement Report) at 22. Under normal operation, "[t]he fiberglass sucker rods are designed to always be under a tension load." *Id.*; *see also* Ex. F at 51:19-52:4 (explaining that end fittings are "normally always in tension from end fitting to end fitting"). Back pressure, by contrast, refers to a "case where the end fitting may be loaded in compression." Ex. F at 51:19-52:4. As Mr. Hetmaniak explained, this is an "inadvertent" condition where "instead of you pulling on the sucker rod you're pushing it." *Id.* Consequently, Mr. Hetmaniak testified that, to properly assess whether an end fitting is compensating for back pressure, an FEA analysis must be performed with the end fitting loaded under compression (e.g. where the adjacent end fittings are being pushed together as opposed to being pulled apart):

9

> Q. So, how would you create an FEA to assess whether or not an end fitting is compensating with the back pressure associated with the sucker rod and the end fitting?
>
> A. Well, you would have to run an FEA setup and load the part that way, you know, to where you're pushing it together as opposed to pulling it.
>
> Q. Okay. And without running that FEA, you couldn't know the answer?
>
> A. ***I couldn't tell you. I don't know.***

*Id.* at 52:12-20 (emphasis added).

Indeed, Mr. Hetmaniak made it clear that not only did he fail to perform an FEA, but that it would be impossible for him to even assess whether an end fitting design compensated for back pressure without conducting the requisite finite element analysis ("FEA") where the end fitting loaded in compression:

> Q. And can you tell me whether or not the Morrow end fitting would be compensating for the back pressure associated with a sucker rod in the end fitting?
>
> A. ***I have no idea without running some analysis on it***
>
>         \*       \*       \*
>
> Q. And can you tell me whether or not the changes in the trailing edge lengths of the Watkins sucker rod end fitting design would compensate for the back pressure associated with the sucker rod in the end fitting?
>
> A. ***Not by just looking at it, no.***
>
> ***Q. You would have to do a finite element analysis?***
>
> A. ***That's correct.***
>
>         \*       \*       \*
>
> Q. Okay. Can you tell me whether or not the trailing edges [in Iwasaki] are designed to compensate for the back pressure associated with the sucker rod and the end fitting?
>
> A. ***I can't tell that you either. I don't know.***
>
>         \*       \*       \*
>
> Q. I realized I didn't ask you that question for the Series 100. The drawings we were looking for previously for the Series 100 design, and we were looking at those and trailing edge length did change,

> right?· Between the two wedges?
>
> MR. HOLMAN:· Objection.· Form.
>
> THE WITNESS:· They appear to change, yes.
>
> Q.· ·(BY MR. LUBEZNY)· Right.· And do those changes in the trailing edge length compensate for the back pressure associated with the sucker rod and the end fitting?
>
> *A.· ·I can't say that.· I don't know.*
>
> *Q.· ·What would you have to do to figure that out?*
>
> *A.· ·I would do some analysis on the fitting.*
>
> *Q.· ·What analysis would you do?*
>
> *A.· ·An FEA of it if it's loading*.

Ex. F at 62:11-14; 70:8-21; 50:11-51:4.

Despite the fact that Mr. Hetmaniak clearly understood the analysis that would be required to assess whether an end fitting compensates for back pressure, he never conducted that analysis for the accused products. Mr. Hetmaniak *never* performed nor analyzed a single FEA in which an accused Series 200 or Series 300 was *loaded in compression*. His reports provide nothing more than conclusory assertions that because the trailing edges in the Series 200 and 300 devices "progressively increasing in length from the closed end to the open end of the end fitting," these devices must compensate for the back pressure. Ex. C at 22-23; Ex. E at 20; Ex. C at Ex. G (Hetmaniak '757 Chart for Series 200), p. 19; Ex. E at Ex. G (Hetmaniak '757 Chart for Series 300), p. 17.

Not only does Mr. Hetmaniak's proposed explanation defy his sworn testimony regarding the *necessity* of running an FEA to simulate when an end fitting was loaded in compression (as opposed to guessing as to the operation of forces based on an end fitting's design), but his conjecture does not even come close to satisfying the reliability standards of *Daubert* and Rule 702. *Sorkin v. Amsysco, Inc.*, No. CIV.A. H-04-4182, 2006 WL 1663364, at *3 (S.D. Tex. June 12, 2006), *aff'd*, 223 F. App'x 999 (Fed. Cir. 2007) (excluding opinions when expert did not

11

perform testing but admitted testing was needed); *FURminator, Inc. v. Kim Laube & Co.*, 758 F. Supp. 2d 797, 808 (E.D. Mo. 2010) (excluding opinion that accused tools cut hair when expert did not take steps to eliminate cut hairs resulting from other reasons despite "admitting that he was not able to distinguish a hair that was cut…by one of the tools at issue as opposed to…other reasons"); *Dolphin v. Synthes (USA) Ltd.*, No. 06 CIV. 7719 DAB, 2011 WL 1345334, at *7 (S.D.N.Y. Mar. 25, 2011) ("The fact that [expert] indicated that he needed to do further tests, and never did those tests . . . is determinative as to whether his opinion is reliable."); *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, No. CV 12-1615, 2016 WL 5930868, at *6-7 (E.D. Pa. Oct. 12, 2016).

For example, in *Alpha Pro* the court excluded an expert's opinion that certain garments incorporated the trade secret resins as unreliable when the expert failed to perform admittedly required testing. *Alpha Pro*, 2016 WL 5930868, at *6-7. The expert "determined [the products] exhibited certain characteristics" "based upon [his] visual inspection," but "admitted during [his] deposition that visual or tactile inspection would require lab tests to verify the chemical composition" as that "would be a more 'precise' method." *Id.* at *6. The Court held:

> There is no testimony or other authority cited indicating that [the expert's] method is used by other experts in the industry or relied upon in any other circumstances….the Court is not satisfied that, in formulating the opinions…[he] employed the same methodology and rigor he would have relied upon had he been exercising his expertise in the context of his work for [Plaintiff]. He essentially admitted as much in his deposition when he acknowledged that lab testing was necessary to verify his preliminary visual conclusions and that the results of such testing would be more "precise."…[T]he Court finds that [the expert's] testimony regarding the use of [the trade secret] in [the products] is inadmissible.

*Id.* at *6-7. Just like the expert in *Alpha Pro*, Mr. Hetmaniak based his opinion that the accused products possessed certain characteristics on visual inspection, despite admitting that testing (an FEA) is "the correct thing to do." And while the court in *Alpha Pro* excluded the expert's opinions for not doing "more precise" testing to "verify," Mr. Hetmaniak conceded that he actually had "no

12

idea" whether an end fitting device compensated for back pressure without an FEA. *See supra.* Thus, Mr. Hetmaniak's opinions should likewise be excluded on this limitation as unreliable and irrelevant because they are not based on the analysis that Mr. Hetmaniak admitted is required.

> **D.  The Court Should Exclude Mr. Hetmaniak's Opinions That The Wedge Shape Configurations In The Accused Series 200 and Series 300 End Fittings "Define A … Distribution of Force"**

The asserted '951 patent claims all require that, for each wedge, the length of the leading edge, the length of the trailing edge and the size of the angle "define a …distribution of force in the … wedge portion." *See* Ex. A at claims 7 and 21.  The Court construed this limitation to mean "provide a [first/second/third] distribution of force in the [outer/intermediate/inner] wedge portion."  Dkt. 215 at 27-31; Dkt 259.  In doing so, the Court expressly *rejected* Plaintiffs' proposed construction that the distribution of forces can be determined by *factors other than the claimed wedge features*:

> the Report recommends rejecting Plaintiffs' construction because it is contradicted by the arguments made by the Patent Owner to the PTAB. The Patent Owner cannot represent to the PTAB that the wedge features determine or define the stress or compressive force applied to a particular wedge in order to avoid invalidity, but then take a broader position before the Court

Dkt 215 at 31.  The Special Master's Recommendation (which was adopted by the Court) explained that, to meet the claims, the distribution of force must be provided by the leading edge, trailing edge, and angle between them, and not other factors:

> The Patent Owner also argued that "the intrinsic evidence is unambiguous in describing how the force applied to each wedge portion *is determined by the leading edge, trailing edge, and angle there between*." (Id. at 27) (emphasis added). Accordingly, *the Patent Owner disclaimed anything other than the wedge shape configuration (i.e., the leading edge, trailing edge, and angle between the leading edge and trailing edge of each wedge portion) from providing the distribution of force in the wedge portion*.

*Id.* at 30 (second emphasis added).  Indeed, the Court's construction expressly "***reject[ed] any***

13

*argument that anything other than the wedge shape configuration provides the distribution of force* in the wedge portion." *Id.* at 30-31 (emphasis added).

Nevertheless, Mr. Hetmaniak offers no testing or other scientific evidence to prove that the wedge shape configuration--rather than numerous other factors present in the end fitting--provides the distribution of force.  Instead, Mr. Hetmaniak simply makes the blanket assertion that the "physical configurations of the wedge portions determine the distribution of force" in the Series 200 and 300 devices."  Ex. C at Ex. F (Hetmaniak '951 chart on Series 200), pp. 4, 8; Ex. E at Ex. F (Hetmaniak '951 chart on Series 300), pp. 4, 6.  But, Mr. Hetmaniak testified at his deposition that there are numerous other factors could provide the distribution of forces in each wedge:

> Q.· ·Right.· What I'm asking is:· Do you know whether or not it is the length of the leading edge, the length of the trailing edge, and the angle between them which defines the distribution of force?
>
> A.· ·Well, *there may be other factors that figure into that, you know, as far as other construction, details of the fitting, the epoxy, those kinds of things*.
>
> Q.· ·What other things would factor into it?
>
> A.· ·The properties of the epoxy -- assuming that we're talking about a sucker rod assembly like we've been talking about for this whole case.

Ex. F at 34:19-35:4.

Mr. Hetmaniak performed no testing to assess whether it is the claimed wedge shape or these other factors that provide the claimed distribution of force in the Series 200 and 300 devices. In fact, Mr. Hetmaniak does not even attempt to explain in his reports why the wedge portions, as opposed to other factors, would provide the distribution of force.  As such, Mr. Hetmaniak has offered no scientific basis for his opinion that the wedge shape configuration provides the distribution of force in each wedge portion as required by this Court's construction.  His conclusory opinions on this limitation are therefore not adequately supported, contrary to this Court's claim

14

construction order and should be excluded as unreliable and irrelevant. *See, e.g., Mission Pharmacal Co. v. Virtus Pharm., L.L.C*., No. SA-13-CV-176-PM, 2014 WL 12480016, at *3 (W.D. Tex. Sept. 12, 2014) (excluding opinions on dissolution rate of compound with excipients as irrelevant because claim construction of "iron compound" excluded excipients); *BMC Software, Inc. v. Servicenow, Inc*., No. 2:14-CV-903-JRG, 2016 WL 367251, at *2 (E.D. Tex. Jan. 29, 2016) (Experts are "excluded from providing any opinions based on an interpretation of the Court's construction that is the equivalent of any construction that the Court previously considered and expressly rejected"); *cf. Elder,* 205 F.R.D. at 193-194 (conclusory opinions "without any elaboration or reasoning" should be excluded as they "will not assist the trier of fact").

### E. The Court Should Exclude Mr. Hetmaniak's Opinions That The Accused Series 200 and Series 300 Devices Practice The "Ratio" Limitations

In addition to the functional limitations discussed above, the asserted claims also recite specific requirements concerning the geometric shape of the end fitting. Claim 77 of the '757 patent, for instance, requires that the *ratio* of the trailing edge to the leading edge is largest in the first wedge (closest to the closed end of the end fitting) and gets smaller with each subsequent wedge. Ex. B at claim 77. In particular, claim 77 requires:

> *the ratio* of the first trailing edge to the first leading edge of the first wedge shaped portion is *larger than the ratio* of the second trailing edge to the second leading edge of the second wedge shaped portion, and *the ratio* of the second trailing edge to the second leading edge of the second wedge shaped portion is *larger than the ratio* of the third trailing edge to the third leading edge of the third wedge shaped portion . . .

*Id.* In his reports, Mr. Hetmaniak states that the leading and trailing edges in the Series 200 and 300 end fittings practice the claimed configuration. Ex. C at Ex. G, p. 19; Ex. E at Ex. G, pp. 17-18. Once again, Mr. Hetmaniak provided no analysis, measurements, or proof of any kind to support that opinion. The entirety of Mr. Hetmaniak's conclusory opinion on this limitation

15

(quoted below) amounts to little more than repetition of the claim language:

> The Series 200, as with this claim, has a greater ratio of length between the trailing edges and the leading edges in the interior of the end fitting. That is to say, the differences in lengths between the leading edge and the trailing edge are greatest in the wedge-shaped portions proximate to the open end, and least proximate to the closed end, resulting in the claimed relationship of trailing-to-leading ratios to wedge shaped portions.

*See* Ex. C at Ex. G, p. 19; *see also* Ex. E at Ex. G, pp. 17-18 (providing similar opinion on the Series 300 end fitting).

At his deposition, Mr. Hetmaniak was asked about the basis for his assertions. He admitted that his expert reports provided no evidence to support his opinion on the "ratio" limitations:

> Q.· ·Okay.· So, how do you know whether or not the ratio of the trailing edge to the leading edge in each wedge is changing?
>
> A.· ·I must have looked at that, I just don't recall.
>
> Q.· ·You don't know what your basis for saying that is?
>
> A.· ·No, I just don't recall when I did it.
>
> **Q.· ·*Do you see that evidence in your claim chart?***
>
> **A.· ·*I don't specifically cite that, no.***

Ex. F at 136:5-12. Ultimately, Mr. Hetmaniak admitted that he never even attempted to measure the ratios of the trailing edge to the leading edge of the accused products:

> Q.· ·And, again, similar question to when we talked about the Series 300.· You didn't measure the ratios of the trailing edge to the leading edge for each wedge, correct?
>
> MR. HOLMAN:· Objection.· Form.
>
> THE WITNESS:· I did not.· The dimensions are there for their lengths, but *as far as calculating the ratios, I did not*.

*Id.* at 177:2-8  As such, Mr. Hetmaniak conceded that his reports offered no basis to support his opinion that the accused products practiced the "ratio" limitation of claim 77:

> Q.· ·(BY MR. LUBEZNY)· Right.· *So you have no basis in your report* to say that the ratio of the trailing edge to the leading edge of the interior wedge shaped portion is larger than the ratio …of the trailing edge to the leading edge of each subsequent adjacent trailing

16

> edge to the leading edge ratio?
>
> MR. HOLMAN:· Objection.· Form.
>
> THE WITNESS:· *That's correct*.

*Id.* at 177:9-16.

Consequently, by Mr. Hetmaniak's own admission, his opinions on the "ratio" limitations are conclusory, unsupported by any data or measurement, and so should be excluded as unreliable and irrelevant. *See Elder,* 205 F.R.D. at 193-194 (conclusory opinions "without any elaboration or reasoning" should be excluded as they "will not assist the trier of fact"); *MGM Well*, 2007 WL 150606, at *4 (excluding "opinions [that] appear to be mere *ipse dixit*," "parroting" party's views without "independent analysis" as expert did not apply "the same rigor" he would have "to his work in the field of electrical engineering").

**F.     The Court Should Exclude Mr. Hetmaniak's Opinions That The Accused Series 200 and Series 300 Devices Practice The "Obtuse" Limitation**

Claim 32 of the '757 patent also requires a particular geometry in that it recites that the "angle between the leading edge and the trailing edge *of each concaved surface is obtuse*." Ex. B at claim 32.  Here again, Mr. Hetmaniak's report offers nothing more than a conclusory assertion that the angles in the accused Series 200 and 300 end fittings practice this limitation.  Ex. C at Ex. G, p. 15; Ex. E at Ex. G, p. 12.  His report provides no measurements or analysis.  Indeed, Mr. Hetmaniak admitted at his deposition that he never measured the angles between the leading and trailing edges at each concave surface. Ex. F at 181:16-23. Consequently, Mr. Hetmaniak conceded that he could not actually say whether the claimed angles in the accused end fittings are obtuse:

> Q.· ·Okay.· All right.· So, claim 32 says that the angle between the leading edge and the trailing edge of each concave surface is obtuse.· What does obtuse mean?
>
> A.· ·It's an angle greater than 90 degrees.
>
> Q.· ·Did you measure the angles between the leading edge and the trailing edge of the Series 200?

17

> A.· ·*I didn't measure them, no*.· I'm not sure if they recall that on the drawing or not.
>
> Q.· ·*So, sitting here today you have no basis of which to say that the angle between the leading edge and the trailing edge of each concave surface is obtuse?*
>
> MR. HOLMAN:· Objection.· Form.
>
> THE WITNESS:· *I don't know that they aren't.*
>
> Q.· ·(BY MR. LUBEZNY)· *You don't know one way or another?*
>
> A.· ·*I not did not measure them*.

*Id.* at 181:16-182:5.

Accordingly, as with the "ratio" limitations discussed above, Mr. Hetmaniak's opinions on the "obtuse" limitation of claim 32 are nothing more than unsupported, conclusory allegations. By Mr. Hetmaniak's own admission, he does not actually know whether the relevant angles in the accused devices are obtuse because he did not measure them. His opinions on this limitation should be excluded as unreliable and irrelevant. *See Elder,* 205 F.R.D. at 193-194 (conclusory opinions "without any elaboration or reasoning" should be excluded as they "will not assist the trier of fact"); *MGM Well*, 2007 WL 150606, at *4 (excluding "opinions [that] appear to be mere *ipse dixit*," "parroting" party's views without "independent analysis" as expert did not apply "the same rigor" he would have "to his work in the field of electrical engineering").

## V.   CONCLUSION

For all of the foregoing reasons, Defendants respectfully ask the Court to grant this motion and exclude the above-described portions of Mr. Hetmaniak's expert report and testimony.

Dated: November 8, 2019

Of Counsel:

Timothy Carroll
Manny J. Caixeiro
Steven Lubezny
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Telephone: (312) 876 8000
Fax: (312) 876 7934
tim.carroll@dentons.com
manny.caixeiro@dentons.com
steve.lubezny@dentons.com

*/s/ Jennifer Parker Ainsworth*
Jennifer Parker Ainsworth
Texas State Bar No. 00784720
jainsworth@wilsonlawfirm.com
WILSON, ROBERTSON & CORNELIUS,
P.C. 909 ESE Loop 323, Suite 400
P.O. Box 7339 [75711]
Tyler, Texas 75701
Telephone: (903) 509-5000
Facsimile: (903) 509-5092

*Attorneys for Defendants/Counterclaim Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019 a copy of the foregoing was served on counsel of record by electronic means pursuant to the court's Electronic Case Filing (ECF) system:

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth

## CERTIFICATE OF CONFERENCE

I certify that the parties have complied with Local Rule CV-7(i)'s meet and confer requirement. Plaintiffs' counsel **opposes** this motion.

*/s/ Jennifer P. Ainsworth*
Jennifer P. Ainsworth