1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
2                       MIDLAND-ODESSA DIVISION

3  FINALROD IP, LLC, ET AL  ) Docket No. MO 15-CA-097 ADA
                            )
4  vs.                      ) Midland, Texas
                            )
5  JOHN CRANE, INC., ET AL  ) February 21, 2020

6

7                    TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE ALAN D. ALBRIGHT

8  APPEARANCES:

9  For the Plaintiff:        Mr. John D. Holman
                             Mr. Terry B. Joseph
10                           Mr. David M. Lodholz
                             Matthews, Lawson, McCutcheon
11                           & Joseph, PLLC
                             2000 Bering Drive, Suite 700
12                           Houston, Texas 77057

13 For the Defendant:        Ms. Jennifer Parker Ainsworth
                             Wilson, Robertson & Cornelius, PC
14                           909 ESE Loop 323, Suite 400
                             Tyler, Texas 75701

15
                             Mr. Manny J. Caixeiro
16                           Dentons US, LLP
                             601 South Figueroa Street,
17                           Suite 2500
                             Los Angeles, California 90017

18
                             Mr. Timothy J. Carroll
19                           Dentons US, LLP
                             233 South Wacker Drive,
20                           Suite 5900
                             Chicago, Illinois 60606

21
   Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
22                          501 West 5th Street, Suite 4153
                            Austin, Texas 78701
23                          (512)391-8792

24

25 Proceedings reported by digital stenography, transcript
   produced by computer.

09:13:26

09:13:26   1          THE CLERK:  Court calls:  Midland Case

09:13:31   2    7:15-CV-97, <u>Finalrod IP, LLC, Et Al vs. John Crane, Inc.,</u>

09:13:37   3    <u>Et Al</u>, for a motion hearing.

09:13:38   4          THE COURT:  Good morning, gentlemen.

09:13:39   5          If you guys would be so kind as to introduce

09:13:42   6    whoever's going to be speaking and, also, who's at your

09:13:45   7    table and, also, if you have any clients here.

09:13:51   8          MR. LODHOLZ:  Good morning, Judge.

09:13:52   9          David Lodholz for Finalrod and plaintiffs.  This

09:13:56   10   is John Holman and Terry Joseph, and we've got the motions

09:14:00   11   split up between us.  So we'll all be speaking at various

09:14:02   12   times, if that's okay.

09:14:03   13         THE COURT:  That's great.  And if you -- when you

09:14:05   14   come up to do the first time to argue something, it will

09:14:10   15   help us if you'll just remind us and we'll put your name

09:14:13   16   down on the record, so that will help us find stuff if we

09:14:17   17   need it.

09:14:18   18         Counsel.

09:14:18   19         MS. AINSWORTH:  Good morning, your Honor.

09:14:20   20         Jennifer Ainsworth on behalf of the Defendants

09:14:23   21   Endurance and John Crane Production.  With me is Tim

09:14:26   22   Carroll, lead counsel, and Manny Caixeiro, and we will all

09:14:29   23   three be arguing motions, also.  So we'll be sure and

09:14:35   24   identify ourselves.

09:14:35   25         THE COURT:  Midland by east Texas.

09:14:38  1          MS. AINSWORTH:  That's right.

09:14:39  2          THE COURT:  Your reputation goes far and wide and

09:14:42  3  well deserved.

09:14:43  4          MS. AINSWORTH:  I don't know.  Hopefully it

09:14:45  5  hasn't gotten there yet.

09:14:46  6          THE COURT:  Very good.  I think Josh told you

09:14:48  7  that I was going to take up the motion with regard to the

09:14:52  8  -- the Daubert motion with regard to the plaintiffs'

09:14:57  9  damages expert and primarily the -- well, I guess there's

09:15:01  10  the primary issue of the hypothetical negotiation date.

09:15:08  11  And then, I guess we have some other issues to take up

09:15:11  12  also with respect to methodology, but that's the one I

09:15:13  13  will primarily be interested in.

09:15:15  14          And that would be your motion.  Yes, sir.

09:15:21  15          MS. AINSWORTH:  Yes, your Honor.  And Mr.

09:15:22  16  Caixeiro will be arguing that for defendants.

09:15:28  17          THE COURT:  And we have read everything that you

09:15:29  18  all have submitted pretty carefully.  I have personally

09:15:34  19  read everything that you all have submitted on the

09:15:35  20  Dauberts and prepared for this, which isn't to discourage

09:15:41  21  you from saying anything other than I just wanted you to

09:15:45  22  know that I -- we are pretty prepared for this.  So -- and

09:15:46  23  you don't need to, you know, I have -- I pretty well

09:15:50  24  understand the basics about how damages work in

09:15:53  25  plaintiff's cases.  And so, not at the level, you know, as

| | |
|---|---|
| 09:15:56 | 1  someone as fine as Ms. Ainsworth, but I've had the great |
| 09:16:02 | 2  benefit of having tried some cases and put on damages |
| 09:16:04 | 3  experts.  So I'm pretty up to speed with regard to the |
| 09:16:06 | 4  issues in this case. |
| 09:16:08 | 5          MR. CAIXEIRO:  Your Honor, we were going to, at |
| 09:16:10 | 6  times at least, walk through a PowerPoint.  May we pass a |
| 09:16:13 | 7  copy up to you? |
| 09:16:13 | 8          THE COURT:  Sure.  Thank you. |
| 09:16:32 | 9          MR. CAIXEIRO:  Good morning, your Honor.  This is |
| 09:16:35 | 10 Manny Caixeiro. |
| 09:16:36 | 11         THE COURT:  Yes, sir. |
| 09:16:37 | 12         MR. CAIXEIRO:  For the defendants. |
| 09:16:39 | 13         So fundamentally, there are two reasons we're |
| 09:16:41 | 14 seeking to exclude the testimony of Mr. Marcus Reading. |
| 09:16:46 | 15 The first, as you indicated, is that he has used the wrong |
| 09:16:50 | 16 hypothetical negotiation date. |
| 09:16:53 | 17         As a matter of background here, Mr. Reading |
| 09:16:55 | 18 opines on one product that is the Series 300 product. |
| 09:16:58 | 19 That product was released in November of 2018.  However, |
| 09:17:03 | 20 Mr. Reading is conducting a hypothetical negotiation at a |
| 09:17:06 | 21 date of June 2015.  Now, June 2015 is the date that a |
| 09:17:12 | 22 different product, the Series 200, was released.  In this |
| 09:17:17 | 23 case, plaintiffs already have an expert opining on damages |
| 09:17:20 | 24 for the Series 200.  That's Mr. Leathers.  He's already |
| 09:17:24 | 25 conducted a hypothetical negotiation on the Series 200. |

09:17:27  1   And while I look forward to cross-examining him, we don't

09:17:30  2   have a Daubert motion on him right now.  That's a separate

09:17:33  3   issue.

09:17:33  4           Relevant to this point is that the Series 300,

09:17:38  5   what Mr. Reading is testifying about, was neither released

09:17:42  6   nor even conceived in June of 2015.

09:17:46  7           THE COURT:  So there was no infringement possible

09:17:48  8   under the Series 300 until November of 2018.

09:17:52  9           MR. CAIXEIRO:  Correct, your Honor.  Correct.

09:17:53  10          And during that intervening period, there were

09:17:56  11  certainly some changes.  There was obviously a new end

09:17:59  12  fitting.  The market changed.  There's record -- the

09:18:02  13  evidence in the record of this -- and your Honor may even

09:18:04  14  recall, the oil market took a big hit in that 2014, '15,

09:18:08  15  '16 period.  And equally important is in 2015, the owner

09:18:13  16  of defendants' business was John Crane.  That's an

09:18:19  17  international conglomerate based overseas.  In 2018, it

09:18:23  18  was Endurance Lift Solution, which is a local Midland

09:18:26  19  company.  So fundamentally, you're going to have a

09:18:28  20  different dynamic in a June 2015 negotiation and a

09:18:31  21  November 2018 negotiation.

09:18:33  22          I won't belabor the point on the law.  I think

09:18:37  23  your Honor is well versed in the fact that the law

09:18:40  24  requires a correct hypothetical negotiation date.

09:18:42  25          THE COURT:  I am.

09:18:43  1          MR. CAIXEIRO:  And there's plenty of precedent of

09:18:45  2  excluding expert analyses, damage analyses when the wrong

09:18:49  3  date is used.

09:18:52  4          THE COURT:  And I've reviewed the case from the

09:18:53  5  Eastern District of Texas, as well.

09:18:55  6          MR. CAIXEIRO:  Yes.  Yes.

09:18:56  7          Now, I think what's relevant here is, there's no

09:18:59  8  authority supporting the methodology that Mr. Reading is

09:19:04  9  using, which is effectively taking a hypothetical

09:19:07  10  negotiation date for early different product and applying

09:19:10  11  it to a later release product.  And I'm not going to get

09:19:13  12  into great detail, but if I can just show your Honor

09:19:16  13  what's at the -- this demonstrative here.

09:19:22  14          This is the Series 200 end fitting -- a

09:19:25  15  cross-section of the end fitting, and you'll see, there's

09:19:27  16  about four pronounced wedges, quite a bit of epoxy, and a

09:19:33  17  different mix of materials.  And I could tell you and the

09:19:36  18  evidence suggests this, this is much harder to manufacture

09:19:39  19  and much more expensive to manufacture.  This is the

09:19:43  20  Series 300, which has a multitude of smaller wedges,

09:19:46  21  different angles, much less epoxy, different mix of raw

09:19:50  22  materials, easier and cheaper to manufacture.

09:19:55  23          THE COURT:  In the 300.

09:19:56  24          MR. CAIXEIRO:  In the 300.  Yes.

09:20:02  25          So, again, there's no methodology -- there's no

09:20:05  1  case law or authority to support what Mr. Reading has

09:20:09  2  actually done here.  So what the plaintiffs have tried to

09:20:11  3  do is argue based on several other cases, including the

09:20:15  4  Smith & Nephew vs. Arthrex case that deal with judicial

09:20:21  5  estoppel.  As we noted in our brief, I'm very familiar

09:20:23  6  with the case.  I'm actually the lawyer who argued that

09:20:26  7  damages argument in that case, and there are two key

09:20:29  8  differences and reasons why that argument fails.

09:20:32  9          The first is the obvious one:  That's an estoppel

09:20:34  10  case.  There was an earlier judgment based on an earlier

09:20:36  11  set of products, and the judge decided that after a lot of

09:20:41  12  record, a lot of evidence, expert opinions on the issue of

09:20:45  13  how similar or different the later products were to the

09:20:49  14  earlier products, the judge decided that there was no

09:20:52  15  substantial difference; therefore, the earlier royalty

09:20:55  16  rate would apply to the later products.

09:20:57  17          And even if we were to forgive the fact that this

09:21:00  18  is not an estoppel situation, what's -- what the

09:21:04  19  plaintiffs can't overcome is that Mr. Leather -- I'm

09:21:07  20  sorry, Mr. Reading's not opined, Mr. Leathers has not

09:21:10  21  opined, there's nobody who's opined that the Series 300 is

09:21:14  22  substantially similar to the Series 200.

09:21:16  23          THE COURT:  Have any of the technical people done

09:21:18  24  it?

09:21:18  25          MR. CAIXEIRO:  No.  Nobody has put that opinion

09:21:20  1    in.

09:21:20  2            THE COURT:  So no one has -- so to the extent the

09:21:23  3    plaintiff was wanting to argue that they are similar

09:21:25  4    enough that you could use the same date for both, there's

09:21:30  5    no -- in my opinion, that would require a technical expert

09:21:34  6    to go through and do what you just did and say, these are

09:21:38  7    essentially the same products technically, at least with

09:21:41  8    respect to -- at least with respect to the patent features

09:21:46  9    that they are similar enough.  And then, from that damages

09:21:51  10   expert -- either of the damages experts could say, based

09:21:54  11   on the technical expert and what he provided with regard

09:21:57  12   to similarity, I can then opine on the economic impact of

09:22:01  13   that, correct?

09:22:03  14           MR. CAIXEIRO:  Correct, your Honor.  And that

09:22:04  15   hasn't happened here.  And focusing, for a moment, on the

09:22:06  16   damages expert, what Mr. Reading has essentially done is

09:22:09  17   treat these as undifferentiated.  He just says there's a

09:22:13  18   hypothetical negotiation from 2015, and then, the rest of

09:22:17  19   his analysis assumes that everything's the same between

09:22:18  20   these products.  And so, for that case --

09:22:21  21           THE COURT:  How does he do that?

09:22:22  22           MR. CAIXEIRO:  Effectively, he doesn't

09:22:24  23   distinguish between them at all.

09:22:26  24           THE COURT:  Okay.  But he doesn't cite to

09:22:28  25   anything, any technical -- he doesn't cite to any basis

09:22:34   1   for -- and let me explain to you the way I see a Daubert

09:22:37   2   is.

09:22:40   3            If he were to have used a method -- this was, I

09:22:44   4   guess, for the plaintiffs now.  If he had used a method

09:22:47   5   that you are arguing was incorrect, I think that's fodder

09:22:51   6   for a method of establishing whether or not they were

09:22:56   7   similar.  That's something I think you can do on

09:22:58   8   cross-examination.

09:23:00   9            Whether or not he should have done that or not,

09:23:04   10   in other words, whether or not he should have gone to a

09:23:07   11   technical expert and have the technical expert provide

09:23:09   12   that opinion, that's the gating factor that I think I'm

09:23:12   13   supposed to play; and if he fails to do that, then I think

09:23:16   14   that's when I decide that the opinion is not reliable.

09:23:20   15            Do you agree with that?

09:23:21   16            MR. CAIXEIRO:  I think that's right.  And I think

09:23:23   17   here, we're in that latter category because what we have

09:23:26   18   here is just a -- an utter failure to use the right

09:23:34   19   hypothetical negotiation date.  And then, if you're going

09:23:36   20   to try to tie it back to that 2015 date, you have to

09:23:40   21   methodologically, you have to at least show through

09:23:44   22   technical and then, I think, from a damages perspective,

09:23:47   23   economic expert testimony that there's no material

09:23:50   24   difference between the two products, and that's just not

09:23:53   25   in the record.

09:23:53  1          THE COURT:  And did Mr. Reading do the latter?

09:23:56  2   Did he do anything -- did Mr. Reading do anything where he

09:24:00  3   said, I can go through the -- for example, the different

09:24:06  4   factors in the Georgia Pacific factors, factor by factor

09:24:10  5   and show that they are -- it wouldn't have made a

09:24:12  6   difference whether it was 2015 or 2018?

09:24:15  7          MR. CAIXEIRO:  No.  Mr. Reading was remarkably

09:24:21  8   unaware of the details of the Series 300 much less how

09:24:25  9   they compare to the Series 200.

09:24:27  10          THE COURT:  He also seemed to be remarkably

09:24:29  11   unconcerned that he had used a different date.

09:24:32  12          MR. CAIXEIRO:  Exactly.

09:24:33  13          THE COURT:  Than the date of infringement.

09:24:35  14          MR. CAIXEIRO:  Correct.  Correct, your Honor.

09:24:37  15          THE COURT:  That was my general sense of the way

09:24:39  16   things were.

09:24:40  17          MR. CAIXEIRO:  That's true.

09:24:41  18          The other thing and I don't know if this is -- if

09:24:44  19   you want to go to the plaintiffs now, I think Mr. Reading

09:24:47  20   was also remarkably unconcerned with the -- the full scope

09:24:53  21   of his apportionment obligation, and I can talk about that

09:24:55  22   now.

09:24:56  23          THE COURT:  Go ahead and talk about that.  But --

09:24:57  24   and so you all know, for better or worse, I actually was

09:25:02  25   -- as you said, you were one of the lawyers in one of the

09:25:05  1   important cases.  I actually was one of the lawyers in the

09:25:09  2   Gateway vs. Lucent case, so I'm pretty familiar with the

09:25:12  3   whole apportionment argument.

09:25:15  4         MR. CAIXEIRO:  Sure.  So if I may, again, just

09:25:18  5   approach.  I think it's important to realize when we talk

09:25:21  6   about Series 300, this is an actual Series 300.  It's a

09:25:26  7   fiberglass sucker rod and it's sold with an end fitting on

09:25:30  8   each side.

09:25:32  9         THE COURT:  And what I'm going to do for purpose

09:25:33  10  of the record is, I have your PowerPoint, and on page 6,

09:25:38  11  you have a graphic of what that is, correct?

09:25:40  12        MR. CAIXEIRO:  Yeah.  Correct.

09:25:41  13        THE COURT:  Just for purposes of the record.

09:25:43  14        MR. CAIXEIRO:  And I'm not sure that this is a

09:25:44  15  300, in particular, in the PowerPoint, but it illustrates

09:25:47  16  the point I'm trying to make, which is, it's sold as a

09:25:49  17  single unit with an end fitting on each side.

09:25:53  18        So I will skip over most of the basics of

09:26:00  19  apportionment.  What I will say is this.  Dr. Beckwith,

09:26:06  20  one of our technical experts, offered the opinion that as

09:26:11  21  between the entire product and the end fitting, the end

09:26:14  22  fitting contributes 70 percent of the value of the entire

09:26:17  23  product.  Mr. Reading accepts that and agrees with that.

09:26:23  24  However, what Mr. Reading did not do is apportion between

09:26:27  25  the patented technology and the rest of the technology in

09:26:31  1   the end fitting; rather, he says that the end fitting

09:26:34  2   contributes to 100 percent of the value.

09:26:37  3        Now, notably, Mr. Reading doesn't have a

09:26:43  4   technical basis to draw that kind of conclusion.

09:26:45  5        THE COURT:  Let me ask you this.  Did -- I get

09:26:48  6   what he said and I have some pretty serious issues with

09:26:52  7   that.  But I didn't see where -- and, of course,

09:26:56  8   everything I'm asking you, I'm hoping to foreshadow for

09:27:00  9   the plaintiff to fill me in.

09:27:01  10  But I didn't see where he had -- where the

09:27:06  11  plaintiffs had had the technical expert do the hard work

09:27:09  12  which I think is required, which is the technical expert

09:27:12  13  says all of this stuff is -- in other words, it's not up

09:27:19  14  to the defendant -- it's not up to the damage person to

09:27:22  15  say that we don't need to apportion because this is all --

09:27:27  16  all adds to the value.  That's, in my opinion, up to the

09:27:30  17  technical person to explain the value of the patented

09:27:35  18  feature with respect to the other features with respect to

09:27:38  19  the overall product.

09:27:40  20  And then, the damages expert takes from what the

09:27:43  21  technical expert said and says, based on that, I'm able to

09:27:48  22  do this with respect to apportionment.  And I didn't see

09:27:51  23  anywhere where the plaintiff had their technical expert

09:27:55  24  provide that information either.

09:27:57  25  Did I miss that?

09:27:58   1          MR. CAIXEIRO:  No, your Honor.

09:27:59   2          And I largely agree with that.  The one thing I

09:28:01   3   would say is, there could be circumstances where there's

09:28:04   4   some sort of economic -- there's some sort of marketing

09:28:07   5   feature, or sales feature, or something maybe that

09:28:09   6   wouldn't fall into the technical aspect.  So we're talking

09:28:13   7   hypothetically here, I could imagine a hypothetical

09:28:15   8   situation where an economic expert might also say, well, I

09:28:18   9   have more to say about that besides what the technical

09:28:20  10   expert says, but certainly you need the technical expert

09:28:24  11   at the baseline, and that's nonexistent in this record.

09:28:27  12          And what I think this case falls into -- we

09:28:31  13   highlighted this in our brief, but I think this is

09:28:33  14   squarely on point with the Federal Circuit's decision in

09:28:37  15   Finjan from 2018, which really holds that when you have a

09:28:40  16   whole product and a subcomponent, here, the sucker rod --

09:28:46  17   the entire sucker rod and an end fitting, and the patent

09:28:49  18   is -- contains technology reading on a portion of that

09:28:54  19   subcomponent, you then have to apportion between the

09:28:56  20   patented technology and the rest of the technology and the

09:28:59  21   subcomponent.

09:29:00  22          And the final point I'll make here is, there's no

09:29:02  23   dispute there's a lot of other technology in the

09:29:04  24   end-fitting subcomponent.  This patent at issue doesn't

09:29:07  25   cover end fittings, doesn't cover wedge end fittings,

09:29:10  1  doesn't cover metal end fittings, doesn't cover epoxy,

09:29:14  2  doesn't cover the raw materials.  It's just a particular

09:29:17  3  -- formation of the end fitting where the compressive

09:29:20  4  forces are greatest as the closed end.  That's a limited

09:29:25  5  amount of the technology within the end fitting.  And by

09:29:28  6  failing to take that into account at all, Mr. Reading has

09:29:31  7  failed to carry out his apportionment obligation.

09:29:33  8          THE COURT:  I had a damages expert argue that if

09:29:37  9  you -- their patent covered the -- basically the hub that

09:29:42 10  you used for the internet, and he argued with a straight

09:29:45 11  face that if that were on an airplane, you could use the

09:29:49 12  airplane as the basis of the value for the royalties, that

09:29:57 13  that didn't go over very well.

09:29:58 14          MR. CAIXEIRO:  It doesn't.  And I think the

09:30:00 15  Federal Circuit in recent years with the Finjan decision,

09:30:02 16  you look at the Power Integrations decision, I think that

09:30:05 17  the clear thrust of where the Federal Circuit is going on

09:30:08 18  this is that you can't make that kind of argument.  You

09:30:10 19  have to finish this apportionment.

09:30:13 20          Actually, final point, because this is the one

09:30:16 21  thing that plaintiffs tried to argue to get around this.

09:30:18 22  They tried to portray this as an entire market value rule

09:30:22 23  case.  Suffice it to say, this is not an entire market

09:30:25 24  value rule case.

09:30:25 25          THE COURT:  I'm pretty familiar with that, too.

09:30:28   1          MR. CAIXEIRO:  Yeah.  And last thing.  One reason

09:30:30   2   it's not is, this expert never even mentioned entire

09:30:33   3   market value rule, so let's --

09:30:34   4          THE COURT:  Oh, really.

09:30:35   5          MR. CAIXEIRO:  We could stop there.  That's

09:30:36   6   attorney argument --

09:30:36   7          THE COURT:  I didn't realize -- I did see the

09:30:38   8   argument that they made about that and I didn't find

09:30:40   9   overly persuasive, but I didn't realize that there's

09:30:43   10   nothing in the damage expert report about.

09:30:46   11          MR. CAIXEIRO:  No.  Not at all.

09:30:47   12          THE COURT:  Okay.  Well, then, let me pivot off

09:30:49   13   that before I hear from the plaintiffs just to give you a

09:30:51   14   heads up on how I see things when we go to trial, which is

09:30:57   15   that if an expert wants to talk about something that's not

09:31:04   16   mentioned in the expert report, that that is a pretty good

09:31:08   17   basis for an objection that will be sustained.  And so,

09:31:15   18   that would be reason enough to preclude that argument.

09:31:19   19          MR. CAIXEIRO:  Thank you, your Honor.

09:31:22   20          THE COURT:  Counsel.

09:31:31   21          MR. LODHOLZ:  Thank you, your Honor.  David

09:31:33   22   Lodholz for the plaintiff.

09:31:35   23          I will start with the negotiation date issue

09:31:39   24   since that's what Mr. Caixeiro covered first.

09:31:43   25          So we agree that the proper negotiation date,

09:31:46  1  whether you use the proper date or not is a legal issue.

09:31:51  2  The issue of what is the proper negotiation date, based on

09:31:55  3  the cases that we've cited, the Smith & Nephew and the

09:31:58  4  Arlington Industries case, is clearly a factual issue,

09:32:03  5  which there's clearly sufficient evidence in this case

09:32:06  6  that the date in 2015 is a sufficient negotiation date.

09:32:13  7       And what Mr. Reading talks about in his opinion

09:32:16  8  and in his deposition testimony is that, you know, he

09:32:20  9  considered it from a business licensing standpoint, what

09:32:25 10  the entities are trying to do at the negotiation time is

09:32:30 11  look for a royalty rate that they can apply going forward

09:32:34 12  to not only the currently infringing product but any

09:32:39 13  future infringing products.  And that's exactly what the

09:32:41 14  Series 300 is is a future infringing product.

09:32:46 15       And there was an issue discussed about the

09:32:48 16  entities being different, and I want to briefly address

09:32:51 17  that because, as the Court is well aware from the history

09:32:53 18  in this case, the way that worked was John Crane

09:32:57 19  Production Solutions sold all of its assets to Endurance,

09:33:01 20  and if there was a hypothetical negotiation and a

09:33:03 21  hypothetical license in 2015, then that would have been an

09:33:09 22  asset that would have been sold to Endurance, which would

09:33:10 23  have covered any infringement of the Superod patents.

09:33:15 24       So, I mean, a license, as the Court knows, is

09:33:19 25  just an agreement not to sue somebody for infringement.

09:33:21  1   So whether it's a Series 200 or a Series 300 is

09:33:25  2   irrelevant.

09:33:25  3           THE COURT:  I don't mean to be disrespectful, but

09:33:27  4   what you just said goes against everything I possibly

09:33:32  5   understand about how damages works.

09:33:40  6           If Apple is infringing with a phone, you go with

09:33:48  7   the hypothetical negotiation date from the infringement of

09:33:50  8   that phone.  You don't -- if they come out with a new

09:33:58  9   phone, four years from now, that also might infringe, you

09:34:05  10  don't go back to the date of the infringement of the first

09:34:10  11  phone that infringed.  They may never come out with

09:34:13  12  another phone.

09:34:17  13          I don't -- I can't imagine a situation where that

09:34:23  14  would be the way the law would work.

09:34:26  15          MR. LODHOLZ:  And, Judge, that's one of the

09:34:28  16  reasons why we found these estoppel cases.  And we do

09:34:31  17  realize that it's a different situation.

09:34:32  18          THE COURT:  There's no estoppel here.  I'm saying

09:34:36  19  you have a product that comes out on X date, and then,

09:34:38  20  another product comes out on Y date.  The hypothetical

09:34:42  21  negotiation for the second product is when that product --

09:34:47  22  when the party begins infringing with that product.

09:34:51  23  Because things change.  That's the whole point of

09:34:56  24  hypothetical negotiation.

09:34:56  25          I can't imagine your -- I can't imagine I would

09:35:02  1  allow in the flip side -- what you're really trying to

09:35:08  2  have Mr. Reading say here is that I can assume that at the

09:35:14  3  hypothetical negotiation in 2015, they would have

09:35:20  4  negotiated a reasonable royalty rate that would apply if

09:35:23  5  another product was released in 2018.  I know it's a

09:35:28  6  hypothetical negotiation, but the hypothetical part is

09:35:31  7  that it didn't really happen.  The parties didn't sit down

09:35:34  8  and do it.

09:35:34  9      But to the extent there's any science or

09:35:41  10  reliability involved in how we structure damages, it is

09:35:45  11  that you start from the point of where the parties were at

09:35:49  12  when the -- because the theory is that if you asked for

09:35:56  13  more money than they wanted to pay -- if you said no, I'll

09:35:59  14  only take a 10 percent royalty rate, they'd say, well,

09:36:03  15  then, we're not going to release the -- we can't make a

09:36:05  16  profit.  We're not going to release that.

09:36:08  17      That -- I mean, I know it's a hypothetical

09:36:11  18  negotiation, but that's the constrict of it is that, in

09:36:16  19  this case, you'd say it was at five percent.  And why is

09:36:18  20  it five percent?  Because in -- for the 200, in 2015, we

09:36:26  21  would have been willing to pay, they would have been

09:36:31  22  willing to accept this.  That everything is different in

09:36:33  23  2018.  I don't -- I can't even follow your argument.

09:36:40  24      MR. LODHOLZ:  So I want to address two points, if

09:36:42  25  I can, from what you just said.

09:36:43  1          First, that everything is different point.  So

09:36:45  2  when their own expert, Mr. Schottelkotte, did the same

09:36:49  3  analysis in his rebuttal report as between 2015 and 2018,

09:36:55  4  he said, I've looked at all of this already in 2015 and

09:36:58  5  I'm looking at it again in 2018 -- and this is on page 5

09:37:01  6  and 6 of his rebuttal report.  That's, I think, Exhibit 4

09:37:05  7  to our response.  And he says, it's all the same, I'm

09:37:08  8  using the same number.  So that's --

09:37:11  9          THE COURT:  And I think an expert can do that.  I

09:37:14 10  think an expert can say, prospectively, I am looking at

09:37:18 11  this, I'm looking at that, and I'm going to determine

09:37:22 12  having looked at everything that this is the result of it.

09:37:26 13  I don't find it possible that you could say, I used the

09:37:30 14  wrong date, which is 2015, but it's okay, it would apply

09:37:38 15  in 2018, anyway, which is what you all are saying.

09:37:41 16          MR. LODHOLZ:  And to that specific point, I want

09:37:44 17  to discuss the Enplas Display case, which is one of the

09:37:49 18  cases that John Crane relies on.  So one of the

09:37:53 19  differences in that case, there was actually two patents

09:37:57 20  at issue, and the expert for the plaintiff gave an opinion

09:38:03 21  on one of the patents that if you look at it from the

09:38:06 22  standpoint of -- and in that case, there's a pretty

09:38:11 23  significant distinction that they were looking at a

09:38:13 24  lump-sum payment, as opposed to, in this case, we have a

09:38:19 25  payout over time.  So there's a reasonable royalty rate

09:38:22   1   and then, a separate base.  And in that case, they were

09:38:24   2   applying to the rate to the base at the same time and

09:38:26   3   getting the jury to come up with one number.

09:38:30   4         But in that case, there was two separate patents,

09:38:33   5   both of which resulted in jury findings of basically a

09:38:38   6   freedom to operate license, which is the same kind of

09:38:41   7   license that Mr. Reading is advocating for in his opinion.

09:38:46   8   And only one of the freedom to operate licenses got

09:38:50   9   overturned; and that was because it was looking at --

09:38:54  10   looking into the past and speculating that products that

09:39:00  11   were being sold that were not even alleged to infringe,

09:39:04  12   that those products were included in the lump-sum two to

09:39:08  13   $4 million number and the jury ultimately came back at

09:39:12  14   four.  And so, it's --

09:39:12  15         THE COURT:  Let me ask you this.  Why did Mr.

09:39:15  16   Reading use the 2015 date?

09:39:16  17         MR. LODHOLZ:  Well, I think I could answer that

09:39:18  18   from a practical -- from just a factual perspective.  When

09:39:22  19   he wrote this original opinion and provided it, he was

09:39:26  20   going to be the expert for the Series 200 and the Series

09:39:30  21   300.  Then there was a later ruling from the Court that he

09:39:34  22   could not opine about the Series 200.

09:39:36  23         THE COURT:  Okay.

09:39:38  24         MR. LODHOLZ:  So from a practical standpoint,

09:39:40  25   that's why he did it that way.

09:39:42  1          THE COURT:  Why didn't he use the correct date?

09:39:44  2          MR. LODHOLZ:  Well, and that's in his deposition,

09:39:46  3  he explains that.  He looked at it from the standpoint of

09:39:48  4  a freedom to operate license, which in the dissenting

09:39:53  5  opinion in Enplas, the judge points out that there's no

09:39:59  6  authority that says a freedom to operate-type license is

09:40:03  7  somehow rejected by the Court, and explains that

09:40:07  8  businesses in a hypothetical negotiation situation -- if I

09:40:10  9  can go back to my table, I can pull it.

09:40:21  10         So this is the Enplas case, Judge, and the

09:40:24  11  dissenting opinion.

09:40:26  12         THE COURT:  Let me see if I understand that

09:40:30  13  scenario of what happened was, he uses the 2015 date.  The

09:40:37  14  Court makes its ruling, and then, did he consciously

09:40:42  15  decide he was not going to amend his report and use the

09:40:46  16  2018 date and say, I don't need to because I'm going to

09:40:50  17  stick with the 2015 date because it's a freedom to operate

09:40:55  18  license?

09:40:56  19         MR. LODHOLZ:  Yes.

09:40:56  20         THE COURT:  Okay.

09:40:58  21         MR. LODHOLZ:  And what the dissenting opinion

09:40:59  22  says, Judge, is a license is intended to alleviate

09:41:03  23  business uncertainty.  No precedent limits the

09:41:06  24  hypothetical negotiation to consideration of a single

09:41:09  25  product.  And then, skipping forward just a couple of

09:41:13  1  words, says the cost and disruption of separate litigation

09:41:17  2  over every existing and future product within the possible

09:41:19  3  scope of the patent is a reasonable consideration in

09:41:24  4  license negotiations, and citing to Rude vs. Westcott out

09:41:28  5  of the Supreme Court.  And that's on page 417 of the

09:41:35  6  opinion in the dissenting section.  So --

09:41:38  7       THE COURT:  I'm going to tell you that I think as

09:41:43  8  a matter of law that that is an incorrect way -- I think

09:41:46  9  that methodology as a matter of law is incorrect.  I could

09:41:52  10 be wrong, but I don't think that's a subject of

09:41:56  11 cross-examination or a fact issue.  I think that

09:41:59  12 methodology is incorrect.

09:42:03  13       Why don't you take up the issue of method he did

09:42:08  14 for apportionment?

09:42:09  15       MR. LODHOLZ:  Sure.  So the apportionment issue,

09:42:17  16 Judge, is clearly a cross-examination issue.  They just

09:42:20  17 disagree with the number he applied to it.  In his

09:42:24  18 deposition, he explains that he reviewed every single

09:42:27  19 aspect of what they say he didn't.  He just said that it's

09:42:31  20 not worth anything.  And what he -- I think there was an

09:42:34  21 issue in the initial argument about the technical stuff

09:42:39  22 that he looked at.  He looked at -- he says he looked at

09:42:42  23 all the technical --

09:42:43  24       THE COURT:  Tell me where -- tell me what your

09:42:47  25 technical expert did to provide him the information that

09:42:50  1   he relied on for apportionment.

09:42:52  2          MR. LODHOLZ:  I don't know specifically what our

09:42:54  3   technical expert did, but I know he relied on Mr.

09:42:58  4   Beckwith's technical explanation, at least as to the 70

09:43:02  5   percent.  And then, he said he looked at the rest of what

09:43:04  6   he talked about as to the 80 percent of the end fitting

09:43:07  7   and said that didn't make sense to him because there was

09:43:11  8   clearly no value from those additional things.  And he was

09:43:16  9   -- I mean, he was saying that based on what the other

09:43:18  10  expert said.

09:43:18  11         So it's not an issue of he didn't consider it.

09:43:22  12  It's an issue of he did consider it, and they just

09:43:24  13  disagree with his evaluation.

09:43:25  14         THE COURT:  But I thought -- what I'd like to

09:43:27  15  know is, what specific information the technical expert or

09:43:34  16  a fact witness who's in the industry, or whatever, what

09:43:38  17  they specific -- what you were going to specifically rely

09:43:41  18  upon -- let me back up.

09:43:44  19         I want to know where in Mr. Reading's report he

09:43:49  20  cites what he relied on with respect -- what he relied on

09:43:55  21  to provide his testimony with respect to apportionment.

09:44:00  22         Do you have Mr. Reading's damages report?

09:44:03  23         MR. LODHOLZ:  I have written down here that it's

09:44:08  24  in paragraph 63 through 65 of his report.

09:44:11  25         THE COURT:  If you have that, I'll take a look at

| | | |
|---|---|---|
| 09:44:13 | 1 | it.  Or we could put it up on the screen.  However you |
| 09:44:26 | 2 | want to do it, I'm happy to take a look at it. |
| 09:44:29 | 3 | MR. LODHOLZ:  He also further elaborates on that |
| 09:44:31 | 4 | in his deposition.  And that's actually the section on |
| 09:44:47 | 5 | ancillary convoyed sales, I think.  But, I mean, that's |
| 09:44:58 | 6 | another point that we make.  Oh, I'm sorry. |
| 09:45:13 | 7 | THE COURT:  Why don't you just hand it to me.  If |
| 09:45:15 | 8 | you'll hand it to Katherine.  I'm looking at page 17 of 31 |
| 09:45:27 | 9 | of Mr. Reading's expert -- and this is his only report? |
| 09:45:34 | 10 | MR. LODHOLZ:  He did a supplement? |
| 09:45:35 | 11 | THE COURT:  Let me ask you this.  Is this the |
| 09:45:36 | 12 | only -- are paragraphs 63 through 65 the only parts of his |
| 09:45:41 | 13 | report where he discusses apportionment and his basis for |
| 09:45:45 | 14 | it? |
| 09:45:46 | 15 | MR. LODHOLZ:  No.  And, actually, I was saying, |
| 09:45:47 | 16 | after looking at that and my notes again, that's actually |
| 09:45:49 | 17 | like the convoyed sales section. |
| 09:45:51 | 18 | THE COURT:  Okay.  I need whatever section -- |
| 09:45:54 | 19 | here, Katherine.  I need whatever section of the expert |
| 09:45:57 | 20 | report he has where -- I want to see where he discloses in |
| 09:46:00 | 21 | his expert report what he relied on to be able to testify |
| 09:46:05 | 22 | about with respect to apportionment. |
| 09:46:08 | 23 | MR. LODHOLZ:  So that would be in page 24 and 25 |
| 09:46:12 | 24 | of his report. |
| 09:46:13 | 25 | THE COURT:  If you'll hand that to Katherine, |

09:46:15  1    that will be great.  So I'm looking at pages 24 and 25 of

09:46:43  2    Mr. Reading's expert report, under factor 13, correct?

09:46:47  3              MR. LODHOLZ:  Yes.

09:46:48  4              THE COURT:  Okay.  I find paragraph 100 is

09:46:56  5    essentially just a statement of what the law is.  The

09:47:07  6    summary of 101 says that it is clear from the evidence in

09:47:11  7    this case that a critical component of the performance of

09:47:14  8    those sucker rods is the connection of the end fitting to

09:47:17  9    the fiberglass rod.  I don't find that adequate.

09:47:22  10             Paragraph 102 says, sucker rods are comprised of

09:47:26  11   three main components:  The fiberglass rod body, end

09:47:30  12   fittings and epoxy.  It is my understanding that the

09:47:33  13   claims of the patents in suit in this matter relate to the

09:47:35  14   design of the end fittings.  That doesn't contribute

09:47:37  15   anything.

09:47:39  16             Paragraph 103, I do recognize that there are

09:47:42  17   other elements of the fiberglass sucker rod that are not

09:47:46  18   covered by the patents in suit.  According to Mr.

09:47:49  19   Rutledge, manufacturing processes, raw materials and

09:47:52  20   processes all contribute to successful product.  And

09:47:57  21   there's a citation to Mr. Rutledge's deposition.  I find

09:48:04  22   that that is inadequate.

09:48:06  23             Paragraph 104, it is my understanding that John

09:48:11  24   Crane's technical expert, Dr. Scott Beckworth -- Beckwith

09:48:15  25   stated in this report, I have considered how much of the

09:48:19  1  overall sucker rod's value to a customer is attributable

09:48:22  2  to the end fitting as explained below.  In my opinion,

09:48:26  3  approximately 70 percent of the overall value of a sucker

09:48:28  4  rod is attributable to the end fitting.  And approximately

09:48:32  5  30 percent is attributable to the fiberglass body, epoxy

09:48:36  6  and manufacturing and assembly process, and it cites to

09:48:41  7  his declaration.

09:48:44  8          And that is the sum total of what you have

09:48:47  9  submitted with respect to Mr. Reading's analysis or

09:48:55  10 reliance on his -- of what Mr. -- of Dr. -- is it Dr.

09:49:02  11 Beckwith?  Dr. Scott Beckwith said.  I don't,

09:49:16  12 unfortunately -- I don't have the "as explained below in

09:49:20  13 my opinions."  So I don't know what Dr. Beckwith said

09:49:24  14 there.

09:49:26  15         Do you happen to have Dr. Beckwith's report?

09:49:29  16         MR. LODHOLZ:  His report?

09:49:30  17         THE COURT:  Yes, sir.

09:49:31  18         MR. LODHOLZ:  I have it in a separate binder.

09:49:33  19         THE COURT:  If you could get that for me.  I'd

09:49:35  20 like to see -- it doesn't -- I'd like to see page 138 of

09:49:46  21 Dr. Beckwith's report.

09:50:02  22         MR. LODHOLZ:  Page 138, Judge?

09:50:04  23         THE COURT:  That's what it says in the footnote.

09:50:06  24 I mean, you can double check my -- I'm not the greatest at

09:50:09  25 this.  I had someone help me when I was a lawyer.

09:50:12  1          Yes, sir.

09:50:14  2          MR. CAIXEIRO:  I just want to make one point for

09:50:18  3  clarity.  Dr. Beckwith is our expert.

09:50:20  4          THE COURT:  Oh, okay.  And so, let me hear from

09:50:21  5  you real quick.  Is there anything in what Dr. Beckwith

09:50:25  6  says that provides Mr. Reading with what he's looking for?

09:50:31  7          MR. CAIXEIRO:  Well, I'll defer to Ms. Ainsworth

09:50:34  8  to -- on part of that answer, but here's the important

09:50:38  9  thing.  Dr. Beckwith -- they're leaving out a sentence

09:50:41 10  that Dr. Beckwith said, which is that within the end

09:50:43 11  fitting, 80 percent of the value of the end fitting is

09:50:46 12  attributable to the patent.  So Dr. Beckwith did a whole

09:50:50 13  other step of apportionment that's being be excluded by

09:50:53 14  Mr. Reading in this paragraph.  So.

09:50:55 15          THE COURT:  Okay.  And is that -- do you have

09:50:59 16  anything else from the plaintiff you want to submit with

09:51:01 17  respect to the apportionment that Mr. Reading did?

09:51:05 18          MR. LODHOLZ:  I do want to touch a couple of more

09:51:07 19  points, if I can very briefly.

09:51:09 20          THE COURT:  Sure.  You can have as much time as

09:51:11 21  you want.

09:51:20 22          MR. LODHOLZ:  So the cases that Mr. Caixeiro was

09:51:28 23  talking about, the Power Integrations, the VirnetX case,

09:51:32 24  again, these are all royalty-base issues.  So in every

09:51:37 25  expert report on damages in this case, the expert goes

09:51:42  1  through the Georgia Pacific factors and determines the

09:51:48  2  royalty rate applicable, and then, every single expert

09:51:51  3  goes through the royalty base based on the sale of the

09:51:54  4  entire rod.

09:51:56  5        So these rulings on apportionment have to do with

09:52:01  6  the royalty base.  And there's no disagreement amongst the

09:52:05  7  experts in this case that the royalty base should be based

09:52:07  8  on -- because you can't sell an end fitting -- and that's

09:52:11  9  what Mr. Reading explains in his deposition testimony that

09:52:15  10 we've cited.  You can't sell a sucker rod by itself.  It

09:52:18  11 has to have an end fitting.  You can't sell the internal

09:52:20  12 wedge of an end fitting by itself; it has to be the entire

09:52:23  13 end fitting with the rod.

09:52:24  14       And there's a paper in this case written by the

09:52:26  15 defendants called, It's All About The End Fitting.

09:52:30  16 There's a second paper called, It's All About The End

09:52:34  17 Fitting II.  I mean, clearly in this case, the value of

09:52:38  18 this patented technology is the end fitting with the

09:52:43  19 sucker rod.  And there's even claims that we've asserted

09:52:45  20 that are for the entire rod with the end fitting.  And

09:52:49  21 every single claim that we've asserted is for the entire

09:52:53  22 end fitting.

09:52:54  23       So the suggestion that -- you know, I think Mr.

09:52:57  24 Reading did review the different -- the sales

09:53:01  25 relationships, the manufacturing processes, and he says in

09:53:05  1   the marketplace, based on what he's seen with the numbers,

09:53:07  2   that adds no value.  You know, he's looking at the

09:53:11  3   technical report from Mr. Beckwith.  He's looking at the

09:53:14  4   sales difference in the numbers and saying that adds no

09:53:17  5   value.  And if they want to cross-examine him on that,

09:53:21  6   they can.

09:53:21  7          THE COURT:  Do you remember what was covered in

09:53:25  8   the Lucent vs. Gateway case?  Do you remember what the

09:53:28  9   feature was?

09:53:28  10         MR. LODHOLZ:  I do not off the top of my head,

09:53:30  11  Judge.

09:53:30  12         THE COURT:  It was the feature in Outlook that

09:53:34  13  allowed you when you were picking -- going through and

09:53:38  14  trying to fill in the date, it auto-filled the date for

09:53:41  15  you.  And Lucent argued that the base -- the base was the

09:53:52  16  computer that you loaded Microsoft Outlook onto to

09:53:57  17  determine that, and in that case, the circuit made very

09:53:59  18  clear that no, you apportion it down, in that case, not

09:54:04  19  even necessarily to the Microsoft Outlook, but to the

09:54:07  20  value of that feature with respect to it.  They made the

09:54:12  21  same argument that you did, how important the date feature

09:54:15  22  was, how no one -- they got $500 million for that.  It

09:54:21  23  didn't survive appeal.  But.

09:54:25  24         MR. LODHOLZ:  And, Judge, we're not seeking

09:54:27  25  profits from related services.  That's -- the related

<pre>
09:54:32   1   service convoyed sales part and the same way as the
09:54:37   2   apportionment is part of the reasonable royalty.  But the
09:54:41   3   base rate of what's the salable unit, every expert agrees
09:54:46   4   in this case, that's the entire rod with the end fitting.
09:54:49   5          So I think what they've done is a fairly creative
09:54:52   6   way of saying, here's some case law on how do we get to
09:54:56   7   the royalty base and let's apply it to the experts'
09:55:01   8   analysis of the royalty rate and I think that's -- I think
09:55:04   9   that's an incorrect way to look at it just from a legal
09:55:08  10   perspective.  And if we're talking about what the royalty
09:55:10  11   rate is, I mean, those factors -- I mean, he looked at
09:55:12  12   every factor, and the factors are subject to
09:55:15  13   cross-examination.  Why didn't you -- you know, why didn't
09:55:17  14   you consider this?  Why didn't you consider that, instead?
09:55:20  15   That's vigorous cross-examination can correct those issues
09:55:25  16   on the royalty rate for the apportionment.
09:55:29  17          THE COURT:  Anything else?  Okay.
09:55:33  18          The Court is going to grant the motion -- the
09:55:36  19   Daubert motion both respect to the use of an incorrect
09:55:43  20   hypothetical negotiation date.  And the Court also
09:55:49  21   believes that the method of apportionment was not properly
09:55:52  22   done.
09:55:56  23          What does that do with respect to the plaintiffs'
09:55:58  24   claims for the Series 300?  I'd assume -- does that
09:56:04  25   eliminate your damage claim on that?
</pre>

09:56:09  1          MR. LODHOLZ:  I think.

09:56:10  2          THE COURT:  Okay.  And you still have claims

09:56:14  3  under the Series 200, correct?

09:56:16  4          MR. LODHOLZ:  Yes.

09:56:17  5          THE COURT:  Okay.  We can then move on to --

09:56:26  6  well, I have -- I would assume in what my ruling just was,

09:56:33  7  it would subsume the issue of the use of the lump-sum

09:56:40  8  issue, but if it doesn't.

09:56:44  9          MR. CAIXEIRO:  I don't think there's anything

09:56:46  10  left to argue.

09:56:46  11          THE COURT:  Okay.  Let's take up, then, next the

09:56:56  12  position with respect to I believe it's Crane that I

09:57:00  13  should exclude the expert's opinion that the Series 300

09:57:04  14  end fitting has compressive forces.

09:57:39  15          MR. HOLMAN:  Your Honor, I have a quick question.

09:57:41  16  Based upon your ruling just now that removes our damages

09:57:43  17  on the Series 300, I'm kind of a little curious as to how

09:57:49  18  we take up this motion with regard to the Series 300 if

09:57:53  19  we're not allowed to put on damages at trial with --

09:57:57  20          THE COURT:  I assumed you all -- I'm sorry.  I

09:57:59  21  didn't mean to interrupt you.  Go ahead.

09:58:01  22          MR. HOLMAN:  We'd like to put on evidence of

09:58:04  23  infringement if we weren't entitled to put on evidence of

09:58:05  24  damages which would -- -

09:58:06  25          THE COURT:  I had been assuming you guys were

09:58:07  1  competitors and that you would be seeking an injunction,

09:58:11  2  but if you're not, then I'm probably in agreement with

09:58:15  3  you.  But I'd assumed that the plaintiff would continue to

09:58:18  4  seek an injunction on the Series 300.

09:58:22  5          MR. HOLMAN:  Yes, your Honor.  That's correct.

09:58:22  6          THE COURT:  Okay.  Yes, sir.

09:58:27  7          MR. CARROLL:  May I proceed?

09:58:28  8          THE COURT:  I mean, if you don't want to seek an

09:58:30  9  injunction, I'm not telling you how to do it.  I will just

09:58:33 10  tell you walking in here, knowing what I was probably

09:58:36 11  going to rule, that was my assumption that you guys would

09:58:40 12  want an injunction.  But if you -- I'm not requiring you

09:58:45 13  to put on a case in the 300, given my ruling, if you think

09:58:49 14  it would be more effective to not.  It's -- that's

09:58:53 15  entirely up to you.  But this is in response to your

09:58:55 16  question of why it might still be germane to take up this

09:58:58 17  issue.  And you don't have to make that decision here

09:59:01 18  today.  We can take this up.

09:59:03 19          I will tell you, I am -- it is very unlikely I'm

09:59:09 20  going to grant any of the other Daubert motions.  I wanted

09:59:12 21  to hear from you all on them.  I've read them all.  I'm

09:59:17 22  probably 50/50 on all of them.  I'm usually reluctant to

09:59:21 23  grant them, but I'm happy to hear them.  You all might

09:59:27 24  persuade me.  But tell me if you all are going to pursue

09:59:31 25  or think you might pursue an injunction, then I'm happy to

09:59:35  1  continue, but I don't have to.  It's entirely up to you.

09:59:39  2       MR. HOLMAN:  Your Honor, at this time, we are

09:59:41  3  going to continue seeking injunction and proceeding.

09:59:43  4       THE COURT:  Very good.  Thank you.

09:59:44  5       MR. HOLMAN:  Thank you.

09:59:45  6       MR. CARROLL:  Good morning, your Honor.  May I

09:59:46  7  proceed?

09:59:46  8       THE COURT:  Absolutely.

09:59:47  9       MR. CARROLL:  My name is Tim Carroll and I'm lead

09:59:49  10 counsel for the defendants in this case.

09:59:52  11      Your Honor, you alluded to our motion to bar Mr.

09:59:58  12 Hetmaniak's testimony concerning the compressive forces

10:00:00  13 limitation, which works across all claims of both asserted

10:00:04  14 patents in both products accused.

10:00:05  15      THE COURT:  And let me just to help out the court

10:00:08  16 reporter, Hetman -- I'm going to do my best.  Hetmaniak is

10:00:14  17 spelled, H-E-T-M-A-N-I-A-K.  Hetmaniak?

10:00:18  18      MR. CARROLL:  That's how it's spelled but not

10:00:20  19 pronounced.  He pronounces it "Hetmanak."

10:00:22  20      THE COURT:  "Hetmanak."  Okay.

10:00:24  21      MR. CARROLL:  He essentially eliminated the

10:00:26  22 "maniac" from the name.

10:00:27  23      THE COURT:  Okay.

10:00:29  24      MR. CARROLL:  So, your Honor, earlier on the

10:00:31  25 damages issue, you noted the iPhone comparison as to why

10:00:38  1  plaintiffs' use of the wrong date was improper.  The logic

10:00:41  2  behind your comments applies with equal vigor here on the

10:00:45  3  infringement side of the case.  Essentially what the

10:00:46  4  plaintiffs are asking you to do is to allow them to put in

10:00:49  5  evidence that because their expert found infringement

10:00:53  6  based on the finite element analysis of the 200, that he

10:00:58  7  can extrapolate that analysis without actually conducting

10:01:01  8  an FEA to the iPhone 11 or the Series 300.

10:01:05  9         In other words, iPhone 10 infringes, I don't even

10:01:08  10  have to look at the iPhone 11.  I can assume infringement

10:01:12  11  of it without running the requisite test.

10:01:15  12         THE COURT:  Well, let me ask you all this because

10:01:16  13  you all know this -- I've read this stuff, but you all

10:01:20  14  know this better than I do.  When the plaintiff gets up

10:01:21  15  here, is -- what I care about is if the expert can say, if

10:01:28  16  Mr. Hetmaniak -- am I saying that close to right?  If Mr.

10:01:32  17  -- it's Mr., not Dr.  Okay.  If Mr. Hetmaniak can say that

10:01:40  18  for the following reasons, I did the following things that

10:01:48  19  an expert would do and because I get why -- I do

10:01:50  20  understand my analogy on the iPhone, but that has to do

10:01:56  21  with the way we construct a damage analysis.

10:02:00  22         If the plaintiffs' expert can say, I didn't --

10:02:07  23  yes, it's an iPhone 11, but the iPhone 11 is using the

10:02:14  24  same -- I've got an 11.  If the patent were over however

10:02:21  25  it is that I can swipe up and it changes screens, and he

| | | |
|---|---|---|
| 10:02:26 | 1 | says, I looked at the iPhone 10, that's my patent.  The |
| 10:02:29 | 2 | patent's on -- the iPhone infringes because I invented the |
| 10:02:35 | 3 | swipe feature.  I've looked at the iPhone 11, and as an |
| 10:02:39 | 4 | expert, I can tell that there's no difference in the way |
| 10:02:43 | 5 | -- as a technical matter in the way iPhone 11, that |
| 10:02:49 | 6 | function works.  I don't need to go through and do the |
| 10:02:52 | 7 | same test over again because I, as an expert, am able to |
| 10:02:56 | 8 | say it functions in the same way. |
| 10:02:58 | 9 | Why don't I get to -- why doesn't he get to say |
| 10:03:00 | 10 | that?  And then, you get to cross-examine him and say no. |
| 10:03:04 | 11 | Our expert, Dr. Smith, says you left out the fact that in |
| 10:03:09 | 12 | the 11, it -- you know, you could only -- it's even better |
| 10:03:12 | 13 | because you can do it just by looking at it with your face |
| 10:03:16 | 14 | and it will change. |
| 10:03:17 | 15 | MR. CARROLL:  The main difference, your Honor, is |
| 10:03:19 | 16 | that this is not the exterior swipe technology that's in |
| 10:03:22 | 17 | play.  It's what's inside the wedge.  It's what's inside |
| 10:03:25 | 18 | the iOS platform, the operating system that's embedded |
| 10:03:30 | 19 | within the phone.  So the eyeball test here isn't |
| 10:03:32 | 20 | applicable is, we were driving over the Ann Richards |
| 10:03:35 | 21 | bridge last night, I literally thought to myself, I hope |
| 10:03:38 | 22 | the engineers who constructed this bridge didn't just |
| 10:03:40 | 23 | eyeball it.  They didn't just base their mechanical |
| 10:03:44 | 24 | influence and designs based upon looking at it from the |
| 10:03:46 | 25 | outside. |

10:03:46  1          And what Dr. Crichlow, our expert, contends and

10:03:50  2   as we have all agreed in this case up until very recently

10:03:53  3   when plaintiffs through counsel began the position is that

10:03:57  4   there is one way in which you look at what happens inside

10:03:59  5   the end fitting, what happens in those wedge environments,

10:04:02  6   and that is by performing a finite element analysis.

10:04:05  7          And, your Honor, I have on the board here, this

10:04:10  8   issue is not in dispute.  The finite element analysis is

10:04:13  9   the way in which you conduct the assessment of whether the

10:04:18  10  particular action within the wedge is occurring in a way

10:04:21  11  that provides that the compressive forces are pushing

10:04:24  12  toward the open end or toward the close end.  And we don't

10:04:27  13  have to look far and wide or just look at the defendant's

10:04:31  14  evidence in this case.

10:04:31  15         What I have up here is essentially the very words

10:04:35  16  that Mr. Hetmaniak had stated under oath when testifying.

10:04:39  17  And he said, regarding an FEA, he said it's the correct

10:04:43  18  thing to do.  Over and over again, he repeatedly said, if

10:04:46  19  you want to find out where the compressive forces lie, if

10:04:49  20  you want to find out how the back pressure is adjusting

10:04:52  21  within the wedge based on the length or configuration of

10:04:55  22  the trailing edge or leading wedge, the thing to do is to

10:04:58  23  run an FEA.  Over and over again, this expert has said the

10:05:02  24  standard of care is to conduct an FEA.

10:05:05  25         The only reason why we don't have an FEA to

10:05:08   1   support his work is because he was told not to perform

10:05:11   2   one.  And I have up on the white board here, we asked the

10:05:14   3   witness.  He said it's the correct thing to do.  He said,

10:05:19   4   if you really want to know what's going on inside the

10:05:21   5   wedge system, what should you do?  He said, you run an

10:05:24   6   FEA.

10:05:25   7        If you want to really know what the measurements

10:05:27   8   are, how it's impacting the wedge, his view is run an FEA.

10:05:31   9   Why didn't he do one?  He was told not to do one by the

10:05:34  10   plaintiff, the owner of the company.

10:05:35  11        THE COURT:  Okay.  So let me make sure.  Because

10:05:39  12   sometimes we will say something like that, and I want to

10:05:42  13   make sure when you're saying that it was not counsel who

10:05:45  14   told him not to do it, it was the plaintiff himself?

10:05:48  15        MR. CARROLL:  He intimated it was broader than

10:05:49  16   just the claim.

10:05:50  17        THE COURT:  I'm just saying, just for the record,

10:05:52  18   you meant to say plaintiff and not plaintiffs' counsel.

10:05:55  19        MR. CARROLL:  Correct.

10:05:55  20        THE COURT:  Okay.  Very good.

10:05:57  21        MR. CARROLL:  Correct.

10:05:57  22        So he was directly told not to run the FEA.  He

10:06:01  23   said that and he actually made a misrepresentation.  So I

10:06:05  24   think this is a gross set of circumstances here.  We have

10:06:07  25   an expert witness who is saying, I could look at something

10:06:11  1   and tell you it infringes from the outside when, on the

10:06:15  2   other hand, he says, the only way to really know what goes

10:06:17  3   on inside that wedge configuration is to run an FEA.

10:06:21  4          That's the standard of care that he agrees to and

10:06:24  5   said applies, but he deviated from that standard of care.

10:06:27  6   And, again, it's not a hotly contested issue that you have

10:06:29  7   to run an FEA.  The only argument that they have is that

10:06:33  8   he looked at an FEA done on a design that was in

10:06:41  9   consideration at Endurance Lift Solutions, but never

10:06:45  10  commercialized.  It's not the product.

10:06:47  11         So we asked him directly about that very issue

10:06:49  12  and with respect to whether it was the same or a different

10:06:57  13  product.  And, again, Mr. Caixeiro illustrated, a moment

10:07:00  14  ago, that the products were different; and therefore, the

10:07:04  15  plaintiffs' expert's reliance on the wrong date was

10:07:06  16  improper.  Same goes here.  So we asked him questions in

10:07:10  17  his deposition, and we have some of the answers up on the

10:07:13  18  screen for your Honor's benefit.

10:07:16  19         He admitted that the geometry was different, that

10:07:19  20  the measurements were different.  He admitted that the

10:07:22  21  measurements -- or the differences in measurements make a

10:07:25  22  big difference and, again, confirmed that the way to

10:07:29  23  assess infringement here is to run the FEA.

10:07:31  24         THE COURT:  Well, okay.  So let me -- I think I'm

10:07:34  25  going to anticipate what I think the plaintiff will say,

10:07:36    1  but let me ask you.  And they can shake their heads if I'm

10:07:42    2  wrong and so we don't waste anyone's time.

10:07:44    3          But I think what you're saying is two things.

10:07:49    4  One, their guy says, I should have done this.  That's --

10:07:57    5  we have he says, I should have done that, and I get that's

10:08:01    6  good cross-examination stuff.  Even I might have been able

10:08:04    7  -- doing examination might have been able to get that

10:08:07    8  point across.  And I'm sure if we go to trial, like every

10:08:11    9  lawyer, if you think it's worth asking once, you'll ask

10:08:14   10  him about 700 times to make sure the jury gets that.  So I

10:08:17   11  get that.

10:08:22   12          But the question I have is whether or not your

10:08:26   13  position is correct that the only way to do what the

10:08:32   14  expert should have done was by running the FEA test.  And

10:08:38   15  I think the plaintiffs are going to say the fact that he

10:08:40   16  didn't -- they'll deal with -- they've gotta deal with,

10:08:44   17  for better or worse, the fact that he didn't do one, and

10:08:47   18  they can't explain why he didn't do one.  And I believe

10:08:49   19  they're going to say, we have an alternate method that he

10:08:57   20  used and he didn't have to use the FEA method.

10:08:59   21          Is that fair what you guys are going to tell me?

10:09:01   22  Is that the --

10:09:02   23          MR. LODHOLZ:  (Moving head up and down.)

10:09:04   24          MR. HOLMAN:  (Moving head up and down.)

10:09:05   25          THE COURT:  Okay.  So explain to me why you're

10:09:06  1   right.  I mean, I think if you can persuade me that he had

10:09:11  2   to do an FEA test and he didn't and, therefore, whatever

10:09:15  3   he did was not -- you know, is not acceptable, that's a

10:09:19  4   gatekeeping function.  I get it.

10:09:22  5          But to let you know, if they persuade me that

10:09:27  6   maybe he should've, oughta done it and you could

10:09:33  7   cross-examine that, if they could persuade me that there

10:09:34  8   were a number of ways of him arguing why you guys

10:09:41  9   infringe, the FEA being one of them, but there is another

10:09:44  10  way of doing it that's acceptable, also, explain to me why

10:09:48  11  this was the only method he could use, he didn't do it and

10:09:53  12  I should keep him out.

10:09:54  13          MR. CARROLL:  First, because that's what Mr.

10:09:57  14  Hetmaniak agrees is the standard of care.

10:09:59  15          THE COURT:  Well, I don't think he says go back

10:10:00  16  and -- I get he says it's the correct thing to do and you

10:10:03  17  can cross him.  And I get that he says you can't just tell

10:10:07  18  by looking at the geometry, I get that, and you can cross

10:10:10  19  him.  My question is more direct, which is, I don't think

10:10:15  20  he -- I doubt he ever said, or they wouldn't have used

10:10:20  21  him, that if I don't use the FEA method, then whatever my

10:10:25  22  opinion is, isn't acceptable.

10:10:28  23          MR. CARROLL:  I think that's actually the case,

10:10:30  24  your Honor.  He wanted to do an FEA.

10:10:32  25          THE COURT:  I've heard your argument --

10:10:33   1          MR. CARROLL:  He said it was warranted.  It was

10:10:34   2    the correct thing to do if you really want to know what's

10:10:37   3    going on inside the wedge.  These are all his words.

10:10:40   4          THE COURT:  What I'm trying to get across here

10:10:41   5    is, if he's going to say even just that:  I wanted

10:10:46   6    desperately to do that and they wouldn't let me.  I think

10:10:48   7    I should have done that and they didn't let me.  However,

10:10:52   8    I am still taking an oath, I'm still saying it infringes,

10:10:56   9    and I'm able to say that, despite not having done that,

10:11:00  10    because I did it an alternative way and I think that that

10:11:05  11    is acceptable.

10:11:07  12          Explain to me why the alternative way is not

10:11:09  13    acceptable.

10:11:10  14          MR. CARROLL:  Because he did not conduct an

10:11:12  15    alternative examination that provides the scientifically

10:11:16  16    reliable basis for asserting infringement of the accused

10:11:20  17    product.  He looked at a design that was never

10:11:23  18    commercialized and then, as demonstrably different -- and

10:11:28  19    he admits it's demonstrably different than the actual

10:11:32  20    product.  If he had looked at the product and actually

10:11:34  21    carved it in half and analyzed and said, the wedge

10:11:36  22    configurations do X and Y, that doesn't happen.

10:11:39  23          What we have here is mere attorney argument from

10:11:41  24    the plaintiffs' lawyers where they say he looked at

10:11:43  25    various documents, things and otherwise.  And as you know

10:11:46  1  very well, your Honor, looking at various documents and

10:11:49  2  things and making eyeball observations is not science.

10:11:52  3  This isn't even junk science.  This is no science.

10:11:54  4          THE COURT:  So let me make sure I understand your

10:11:56  5  position, and then, I'll hear from them.

10:11:58  6          MR. CARROLL:  Okay.

10:11:58  7          THE COURT:  Your position is, to be admitted as

10:12:05  8  an expert, he should have performed the FEA.  That's the

10:12:10  9  minimum standard of care as it were for an expert if for

10:12:15  10  no another reason than that requires you to lift up the

10:12:17  11  hood and look into -- and do the appropriate analysis.  He

10:12:25  12  admits he didn't do that.

10:12:26  13          MR. CARROLL:  Correct.

10:12:26  14          THE COURT:  If he tells me that's okay -- or not

10:12:33  15  okay, but it's okay, I should still get to testify because

10:12:36  16  I looked at these drawings or whatever it was I looked at,

10:12:41  17  I should still grant a Daubert motion because the use of

10:12:46  18  that methodology in the absence of confirming -- I mean,

10:12:51  19  he could have done that, but then, he would have had to

10:12:53  20  confirm it in some way by actually looking at the product,

10:12:57  21  lifting the hood, maybe not doing an FEA test or not, but

10:13:01  22  at least verifying that what he was looking at in these

10:13:05  23  unrelated documents was accurate based on the actual

10:13:07  24  product itself, right?

10:13:08  25          MR. CARROLL:  If he, for example, with the Series

10:13:08  1  200.

10:13:11  2              THE COURT:  Yes, sir.

10:13:12  3              MR. CARROLL:  He also did not run an FEA.  Dr.

10:13:15  4  Crichlow, our expert, ran an FEA.  He looked at those FEA

10:13:17  5  results and said, Dr. Crichlow, you interpret the

10:13:20  6  compressive forces applying on the other side than the way

10:13:24  7  I look at it, we interpret the data differently.  One

10:13:26  8  expert sums up the compressive forces, the other one finds

10:13:30  9  an average.  He never looked at a Series 300 FEA at all.

10:13:35  10             So without that -- I mean, he admits that the

10:13:38  11 right way to do it was to conduct an FEA.  And he looked

10:13:42  12 at it and the whole basis of his opinion for infringement

10:13:45  13 on the Series 200 is Dr. Crichlow's FEA.  So here, no FEA

10:13:51  14 on the 300.  None.  He didn't look at.  We did not proffer

10:13:55  15 affirmatively an FEA on the Series 300 for this very

10:13:59  16 reason.  He didn't run it.

10:14:00  17             Maybe he hoped Dr. Crichlow would run one.  He

10:14:04  18 was instructed by the client not to run one.  They don't

10:14:07  19 have that alternative view point or analysis.  And, you

10:14:12  20 know, they have arguments to say he looked at it, he

10:14:15  21 reviewed it.  And it's not just with the compressive force

10:14:19  22 limitation.  You know, there's a claim limitation that

10:14:20  23 deals with the ratios between the leading edge, the

10:14:24  24 trailing wedge, and the next set of wedges and looking at

10:14:27  25 the ratio.  He never measured it.

| | | |
|---|---|---|
| 10:14:30 | 1 | There's another claim limitation that deals with |
| 10:14:31 | 2 | whether the design has an obtuse configuration to it.  He |
| 10:14:36 | 3 | never measured it.  He admits never did any of that. |
| 10:14:40 | 4 | THE COURT:  How does he say he did that? |
| 10:14:42 | 5 | MR. CARROLL:  I'm sorry? |
| 10:14:42 | 6 | THE COURT:  I'm assuming he says that it does |
| 10:14:45 | 7 | have that element. |
| 10:14:46 | 8 | MR. CARROLL:  He does.  He recites the claim |
| 10:14:49 | 9 | language. |
| 10:14:49 | 10 | THE COURT:  And that's all. |
| 10:14:50 | 11 | MR. CARROLL:  That's all he does. |
| 10:14:52 | 12 | THE COURT:  Okay.  Let me hear from counsel. |
| 10:15:03 | 13 | Yes, sir. |
| 10:15:04 | 14 | MR. HOLMAN:  Your Honor, John Holman for the |
| 10:15:06 | 15 | plaintiffs. |
| 10:15:08 | 16 | To begin with, I think that you were -- your |
| 10:15:13 | 17 | first inclination of this issue was correct.  This is |
| 10:15:17 | 18 | cross-examination material and to make a few points just |
| 10:15:22 | 19 | to kind of -- |
| 10:15:22 | 20 | THE COURT:  Well, pretend we're not at |
| 10:15:25 | 21 | cross-examination yet.  Pretend that I'm listening to you |
| 10:15:28 | 22 | guys.  And I actually do listen, even though no one here |
| 10:15:31 | 23 | ever thinks I'm listening.  But pretend I am listening, |
| 10:15:33 | 24 | and I'm waiting to hear you put Mr. Hetmaniak on and say, |
| 10:15:39 | 25 | this is my -- at a 50,000-foot level, tell me his expert |

10:15:46  1   opinion as to why they infringe, what you base that on.

10:15:51  2           MR. HOLMAN:  Well, various things, your Honor.

10:15:53  3           THE COURT:  Okay.

10:15:55  4           MR. HOLMAN:  To begin with, Mr. Hetmaniak,

10:15:58  5   incorrectly stated by both counsel, Mr. Hetmaniak had an

10:16:02  6   opinion on the Series 200 and compressive forces prior to

10:16:06  7   ever seeing an FEA and Dr. Crichlow's report.  It wasn't

10:16:09  8   even until weeks after that report came out that we were

10:16:12  9   even given access to those FEA material.  He had already

10:16:16  10  submitted his report on infringement of the Series 200.

10:16:20  11          Clearly it was not necessary for the FEA --

10:16:23  12          THE COURT:  You're missing my question.  Tell me

10:16:26  13  -- you were going to say, Mr. Hetmaniak, do you think that

10:16:28  14  they infringe claim 1?  He's going to say yes.  And you're

10:16:33  15  next going to say, tell me the basis -- tell me what you

10:16:37  16  did that establishes that, and that's what I'm going to do

10:16:40  17  need to hear there.

10:16:41  18          MR. HOLMAN:  Mr. Hetmaniak analyzed the drawings,

10:16:44  19  the engineering drawings for the Series 300.

10:16:46  20          THE COURT:  And these were actual drawings of the

10:16:48  21  300.

10:16:50  22          MR. HOLMAN:  They're actual engineering,

10:16:51  23  manufacturing drawings of the Series 300.

10:16:54  24          THE COURT:  Okay.

10:16:55  25          MR. HOLMAN:  Even prior to that, there's a

10:16:57  1   principle of the geometry -- of the internal geometry of

10:17:02  2   these wedges.  Mr. Hetmaniak explains in his report how

10:17:05  3   these wedge systems work when designed in a certain way.

10:17:07  4   So he knew, based on his experience and what he's learned

10:17:11  5   throughout this case, also with other FEAs, how the

10:17:16  6   specific geometry, whatever it went to direct the

10:17:19  7   compressive forces within the wedge system.  He then

10:17:22  8   looked at the Series 300 and other materials that's cited

10:17:25  9   in his report to base his further explanation on.

10:17:30  10          He then had this -- what is being referred to as

10:17:34  11  sometimes as a prototype Series 300, both counsel says

10:17:39  12  that it's completely irrelevant.  It's not anything like

10:17:43  13  the Series 300.  Your Honor, it is very, very similar.

10:17:47  14  Mr. Hetmaniak even states so in his deposition.

10:17:50  15          THE COURT:  Okay.

10:17:51  16          MR. HOLMAN:  That he was able to take that FEA,

10:17:53  17  extract the dimensions.  Although they were slightly

10:17:55  18  different, he still was able to analyze the series -- the

10:18:00  19  geometric profile in that Series 300 in the same way he

10:18:04  20  did a Series 200.  And so, collectively between the

10:18:08  21  drawings, his prior experience with these FEAs and the

10:18:12  22  prototype FEA, he was able to conclude that there was

10:18:16  23  infringement of the Series 300.

10:18:17  24          THE COURT:  Why didn't he do an FEA?

10:18:20  25          MR. HOLMAN:  I don't know the answer to that

10:18:23  1  question.  If he would have come to us obviously from a

10:18:27  2  practical standpoint and said, I need an FEA to determine

10:18:31  3  whether or not this infringes, an FEA would have been

10:18:33  4  performed.

10:18:33  5       THE COURT:  Well, I mean, he tells the defendants

10:18:39  6  that it's the correct thing to do and that you can't tell

10:18:44  7  just by looking at the geometry where compressive forces

10:18:48  8  are going to be greater, which puts a little bit of shade

10:18:51  9  on your argument that he used his own prior expertise.

10:19:00  10  I'm just curious why he didn't do one.

10:19:07  11       MR. HOLMAN:  As I stand here today, I don't know

10:19:08  12  the answer to that question.  I would like to make a point

10:19:10  13  on some of his comments about why he would need an FEA

10:19:13  14  when asked questions in his deposition.  He was shown, at

10:19:18  15  different times, prior art patent figures with no

10:19:21  16  dimensions, no context, nothing.  Things that he has not

10:19:26  17  analyzed with respect to everything else he had in the

10:19:28  18  Series 300 and was point blank asked, tell me the

10:19:32  19  compressive forces, and he can't as he sits there with the

10:19:34  20  patent figure, with nothing less.  And so, they take that

10:19:38  21  and they put that into their motion and say, look, he

10:19:40  22  said --

10:19:40  23       THE COURT:  I'm ignoring that.  I'm looking at

10:19:42  24  right now, when your expert's going to get on the witness

10:19:45  25  stand and they're going to ask him, did you do an FEA?

10:19:52  1   No.  Do you think it was the correct thing to do?  Yes.

10:19:58  2   Can you tell just by looking at the geometry where the

10:20:02  3   compressive forces are going to be greater without doing

10:20:04  4   one?  No.

10:20:09  5           How do you think that's going to play?

10:20:11  6           MR. HOLMAN:  Well, I think he has an FEA with

10:20:13  7   very, very similar structure to use to depict how these

10:20:17  8   forces are being distributed.

10:20:18  9           THE COURT:  I lost you there.  What FEA does he

10:20:21  10  have?

10:20:22  11          MR. HOLMAN:  There is an FEA on one of the

10:20:25  12  prototypes that was being developed by the Series 300.

10:20:28  13          THE COURT:  And does Mr. Hetmaniak have the

10:20:30  14  ability to say that that prototype is sufficiently like

10:20:33  15  what was being sold?  I mean, does he have in his report,

10:20:38  16  I've compared the prototype to what is actually being

10:20:42  17  accused of infringing, and I'm able as an expert to say

10:20:47  18  that these are sufficiently identical that I can rely on

10:20:51  19  the prototype?  Did he either do that work or does he have

10:20:54  20  that in his report?

10:20:56  21          MR. HOLMAN:  I don't know the verbatim how he

10:20:59  22  explained that, but he did explain the similarities.  In

10:21:03  23  his deposition, he also stated --

10:21:04  24          THE COURT:  In his report, does he say, I used a

10:21:11  25  prototype.  I am sufficiently -- I as an expert am

10:21:16   1   convinced that that's sufficient because for the following

10:21:19   2   reasons, I did this to verify that the prototype was

10:21:23   3   sufficiently analogous or identical to the infringing

10:21:27   4   product that I can make my determination about this, about

10:21:32   5   infringement, not having looked at the actual product

10:21:35   6   because I am able to testify that the prototype is

10:21:40   7   sufficiently similar?  The does he have that in his

10:21:42   8   report?

10:21:42   9          MR. HOLMAN:  Your Honor, I'm not sure if he has

10:21:44   10   that specific -- specifically stated in his report.

10:21:49   11          THE COURT:  Well, then, how is he going to at

10:21:51   12   trial tell the jury that the prototype was similar to the

10:21:56   13   product that you're accusing of infringement?

10:21:59   14          MR. HOLMAN:  He did perform an analysis on the

10:22:00   15   FEA and compared it to the Series 300 and the Series 300

10:22:04   16   drawings.  I just don't know, as I stand here today, the

10:22:09   17   specific details that he went into to explain the

10:22:12   18   overlapping analysis between an actual commercialized

10:22:15   19   version and the FEA that he used as the basis to show the

10:22:20   20   compressive forces and the Series 300.

10:22:24   21          THE COURT:  Give me one second.  Josh.

10:24:13   22          Do you have Mr. Hetmaniak's report here?

10:24:17   23          MR. HOLMAN:  Yes.  That's what I'm trying to

10:24:19   24   locate.

10:24:19   25          THE COURT:  I'd like for you, if you would, on

10:24:21 1  the record anywhere you think that -- I mean, it's clear

10:24:24 2  what the defendant is saying that he didn't do in terms of

10:24:29 3  actually looking at the accused product itself.  If you

10:24:33 4  would point out any pages where Mr. Hetmaniak articulates

10:24:39 5  that I looked at prototypes or I did this, and the reason

10:24:45 6  I did this and the reason why I'm doing this was

10:24:49 7  sufficient, without looking at the actual product itself,

10:24:53 8  is for the following reasons, which would have given them

10:24:57 9  an oppor -- I'm assuming they think that you didn't do

10:24:59 10 that.  If you did do that, then they would have had a

10:25:04 11 chance to cross-examine your expert at a deposition about

10:25:08 12 that.  But I'd like to know what you think is in his

10:25:11 13 report that relates to that.

10:25:32 14         MR. HOLMAN:  In Mr. Hetmaniak's report on the

10:25:36 15 Series 300, he does analyze the FEA provided to him and he

10:25:43 16 said -- his explanation was that he understands that the

10:25:50 17 FEA that was performed was actually performed on the

10:25:52 18 Series 300.  When he goes to compare the dimensions along

10:25:59 19 with the other information extracted from the FEA, he

10:26:02 20 realized it's not the commercialized version.  But he goes

10:26:06 21 on to analyze the FEA and the dimensions within the FEA

10:26:10 22 and shows the forces within the FEA and explains how these

10:26:14 23 forces are being distributed and depicts him throughout

10:26:19 24 page 20 through 27 of his report --

10:26:23 25         THE COURT:  What I care about in the report is

10:26:26  1  where he articulates why he was able to do -- you've heard

10:26:33  2  what the defendants are saying he didn't do that he needed

10:26:36  3  to do.  Right?  That he didn't perform an FEA.

10:26:40  4          MR. HOLMAN:  Yes, your Honor.

10:26:41  5          THE COURT:  And that he didn't, as I understand

10:26:42  6  it, ever actually look at the product, analyze the product

10:26:45  7  itself, correct?  That's your contention?

10:26:49  8          MR. CARROLL:  The contention, your Honor, was

10:26:51  9  that he never looked at an FEA concerning the Series 300.

10:26:54  10 The plaintiffs' counsel has injected a misnomer here by

10:26:57  11 saying that he looked at an FEA for a prototype.  It

10:26:59  12 wasn't a prototype.  It was a design that was within

10:27:02  13 consideration within the company, but it was never

10:27:04  14 commercialized.

10:27:05  15         They had both expert witnesses, including Mr.

10:27:09  16 Hetmaniak, had testified that there are substantial

10:27:13  17 differences between the design that was never

10:27:14  18 commercialized and the actual product.  There's no support

10:27:17  19 in the record for the notion that it's a prototype.

10:27:20  20 There's absolutely no support in the record for any

10:27:23  21 substantial or even just the word "similar,"

10:27:25  22 "similarities."  It's not there.

10:27:27  23         THE COURT:  I got it.

10:27:27  24         So here's my question.  My question is, where in

10:27:32  25 his report does he say, I looked at an FEA for a

10:27:37  1  prototype.  It is okay for me to have looked at an FEA for

10:27:44  2  a prototype with respect to determining whether or not the

10:27:49  3  actual accused product or products infringe because, and

10:27:54  4  then, he lays out what he did to assure himself that the

10:27:59  5  prototype was sufficiently similar to the accused product

10:28:03  6  that would allow him to give that testimony.

10:28:06  7          Does that question make sense?

10:28:07  8          MR. HOLMAN:  Your Honor, it does.  I don't

10:28:09  9  believe he -- I don't believe Mr. Hetmaniak goes to the

10:28:13  10 extent of saying that this, in fact, is a prototype and

10:28:17  11 here are the reasons why I can use it.

10:28:19  12         THE COURT:  What I care about is that counsel for

10:28:24  13 defendants has represented that the prototype that what it

10:28:31  14 is that your expert relied on, that there is no basis for

10:28:37  15 -- to establish that it is sufficiently identical or

10:28:41  16 representative of the accused product.  And I want to know

10:28:44  17 if your expert addressed that concern in his report, and

10:28:50  18 if he did, where it is in his report that he did.  Because

10:28:55  19 I think before he gets to testify at trial, that he did an

10:29:01  20 examination of anything with respect to a prototype, he

10:29:04  21 has to -- I have to know what he did, what his methodology

10:29:08  22 was that enabled him to render that opinion.

10:29:15  23         MR. HOLMAN:  Your Honor, I think --

10:29:16  24         THE COURT:  And that needs to be in the report.

10:29:18  25         MR. HOLMAN:  In the report.  Yes, your Honor.

10:29:19  1  The issue with that is that it was him going into these

10:29:24  2  FEA files and extracting all this information as he's

10:29:27  3  writing his report, before he even determined that there's

10:29:29  4  dimensional differences in commercialized FEA Series 300.

10:29:35  5  Now, there's nothing that I've seen in his report saying

10:29:37  6  that to the fact of what you're explaining that him

10:29:41  7  explaining it's okay for him to use this prototype or this

10:29:45  8  FEA in order to establish infringement.

10:29:48  9          He did in his deposition clarify --

10:29:51  10          THE COURT:  It's gotta be in the report.

10:29:52  11          MR. HOLMAN:  He clarified what his report was.

10:29:54  12          THE COURT:  But I've got -- he has to set forth

10:29:56  13  in his report the gatekeeping feature, as I understand it,

10:30:00  14  is, they can't -- they can't cross -- if he had testified,

10:30:05  15  if he'd put in his report, the reason I was able to use

10:30:10  16  the prototype and not the actual accused product is for

10:30:14  17  the following seven reasons.  They could cross-examine

10:30:19  18  those seven reasons, or they could have their expert say

10:30:23  19  why one through seven is wrong.

10:30:25  20          But your expert doesn't just get to come in and

10:30:28  21  say, I used a prototype and trust me, that's okay.  He

10:30:36  22  needs to articulate why it's okay to use the prototype.

10:30:41  23          Yes, sir.

10:30:41  24          MR. CARROLL:  Your Honor, if I may, it's actually

10:30:43  25  far more egregious than that.

10:30:45  1        THE COURT:  I'm good.

10:30:46  2        MR. CARROLL:  Okay.

10:30:47  3        THE COURT:  And I'm sure, in your opinion, it is,

10:30:49  4   but I think I've got a pretty good lay of the land here.

10:30:52  5        So at any rate, I think I've got this.  I'm going

10:30:56  6   to grant that motion -- that Daubert motion, as well, in

10:31:00  7   the absence of sufficient information in the report to

10:31:04  8   establish the basis of his report -- of his opinion of

10:31:11  9   infringement.

10:31:11 10        I have up next, a motion filed by the plaintiff

10:31:18 11   on the issue, let's see, that Dr. Beckwith's opinion did

10:31:26 12   not take into account the final claim construction and has

10:31:31 13   failed to review and analyze a limit that exists within

10:31:34 14   each asserted claim.  That would be y'all's.  By that, I

10:31:41 15   pointed.  I'm sorry, I should have been more polite.  That

10:31:43 16   would be the plaintiffs' motion.

10:31:51 17        MR. LODHOLZ:  And, again, David Lodholz for the

10:31:57 18   plaintiff, your Honor.  May it please the Court.

10:32:00 19        THE COURT:  Yes, sir.

10:32:01 20        MR. LODHOLZ:  So we have several different points

10:32:05 21   in our motion to exclude Dr. Beckwith.  I want to really

10:32:11 22   focus on what's the issue that the Court just referenced,

10:32:18 23   which is that he doesn't address the proper claim

10:32:20 24   construction.  I'll go through really quick the other

10:32:25 25   ones.  We have an issue with some of the disclosures that

10:32:27  1  he had.  He referenced several conversations and other

10:32:33  2  things that he never produced, conversations with unnamed

10:32:36  3  people that he couldn't even remember.  So I think that's

10:32:39  4  pretty well explained in the brief.

10:32:41  5        But on the claim construction issue, so the issue

10:32:49  6  we have with this, Judge, is in his opinion, in his

10:32:53  7  written report, he did a analysis based on two separate

10:32:59  8  proposed constructions, one by the plaintiff and one by

10:33:02  9  the defendant, and the Court rejected both of those

10:33:05  10  constructions.  And so, the defense proposition was that

10:33:15  11  the -- and the claim construction I'm talking about is on

10:33:17  12  the asymptotic nature of the curvature of the internal

10:33:20  13  geometry of the end fitting.

10:33:22  14        THE COURT:  Okay.

10:33:23  15        MR. LODHOLZ:  And, in particular, the Court

10:33:24  16  determined that for that analysis, you can only look at

10:33:27  17  the transition surface, which is the curvature at the end

10:33:33  18  of the wedge.

10:33:36  19        THE COURT:  Okay.

10:33:37  20        MR. LODHOLZ:  And as the Court's well aware, in

10:33:39  21  the 431 patent, there's figures in it that show clearly

10:33:44  22  the curvature at the end of the wedge going away from the

10:33:47  23  rod, and that's what the asymptotic nature is.  And so, in

10:33:52  24  the proposed construction of the defendants', they said

10:33:55  25  you can look at the end points of the transition surface,

10:33:59 1   and any extrapolation of those end points, if it doesn't

10:34:03 2   cross the rod, that means it's asymptotic.  And the Court

10:34:07 3   expressly rejected that.

10:34:08 4        Now, the plaintiffs' side, we had a proposed

10:34:13 5   construction that you could look at any part of the

10:34:15 6   annulus, and the Court expressly rejected that and said

10:34:17 7   no, you have to -- that's what I was saying earlier, you

10:34:20 8   have to look at the transition surface.

10:34:22 9        And so, when Mr. -- excuse me, Dr. Beckwith

10:34:26 10  performed his analysis, he obviously used the defense

10:34:30 11  proposition, which was the end points, and he said, look,

10:34:33 12  if you take just the end point and extrapolate it out, it

10:34:37 13  obviously doesn't intersect with the rod.  And then, when

10:34:41 14  he took the plaintiffs' construction, he also just used

10:34:45 15  the end points in his report.  And then, he confirmed in

10:34:50 16  his deposition that he only used the end points.

10:34:54 17       And there's a significant quote in the claim

10:35:00 18  construction that is -- I think that the defendants rely

10:35:09 19  on it with the picture of the image of the curvature and I

10:35:13 20  can -- see if I can find it.  It's on page 53 of the claim

10:35:24 21  construction.

10:35:26 22       THE COURT:  Hold yours up and see if I have the

10:35:28 23  same one -- I have one, I think.  Okay.  I have that one,

10:35:32 24  I think.  Yeah, I've got that one.

10:35:33 25       MR. LODHOLZ:  And in discussing the reasons for

10:35:38  1   expressly rejecting the defendants' construction, the

10:35:43  2   Court notes there above the figure that C-C Defendants,

10:35:47  3   which is Finalrod, the plaintiff, provides the following

10:35:51  4   illustration and argued that it illustrates an asymptotic

10:35:55  5   curve that will not intersect the rod.  And it's the

10:35:58  6   figure there in the middle of page 53.

10:36:01  7           And the Court goes on to say, the report agrees

10:36:04  8   that if the illustrated curve is extrapolated from the

10:36:08  9   beginning to the middle of the transition surface, or from

10:36:11  10  the middle to the end of the transition surface, or along

10:36:15  11  any segment, so any points -- any two points on that

10:36:19  12  segment of the transition surface, the underlying curve is

10:36:23  13  asymptotic and will not intersect the rod.  And then,

10:36:29  14  accordingly, the report recommends rejecting C-C

10:36:32  15  Plaintiff's construction because it could be interpreted

10:36:34  16  as limited to a single point on the transition surface.

10:36:38  17          And in the response brief, what we got from

10:36:44  18  defendants is basically that paragraph in quotations,

10:36:51  19  except for the beginning part has changed.  And the small

10:36:56  20  change they make completely changes the meaning of the

10:36:58  21  entire paragraph.  And they say, with reference to this

10:37:02  22  image, referencing, again, the figure, the Court explained

10:37:06  23  that the underlying curve is asymptotic if, and then, they

10:37:11  24  go on to discuss the differentiating points to make it

10:37:15  25  seem like if any of those -- if any curvature is

| | | |
|---|---|---|
| 10:37:20 | 1 | asymptotic, then the entire curvature is asymptotic.  And |
| 10:37:25 | 2 | that's not what the claim construction says. |
| 10:37:28 | 3 | The Court construed approaching the rod |
| 10:37:30 | 4 | asymptotically to mean approaching the rod such that the |
| 10:37:33 | 5 | transition surface -- so that any part of that transition |
| 10:37:35 | 6 | surface will not intersect with the rod, regardless of any |
| 10:37:39 | 7 | extrapolation of that transition surface. |
| 10:37:41 | 8 | So you have to look at the entire surface and |
| 10:37:45 | 9 | that's what -- on page 53, that's what the Court's |
| 10:37:48 | 10 | pointing out is that this figure from the patent clearly |
| 10:37:51 | 11 | shows that that's an asymptotic curvature. |
| 10:37:54 | 12 | THE COURT:  Right. |
| 10:37:55 | 13 | MR. LODHOLZ:  And so, with respect to Dr. |
| 10:37:59 | 14 | Beckwith's opinion, he's only relied on the end points, |
| 10:38:04 | 15 | which would be in direct contradiction of what the Court |
| 10:38:08 | 16 | expressly rejected from the defendant's position.  You |
| 10:38:12 | 17 | can't just look at one point and extrapolate it and say, |
| 10:38:16 | 18 | ah-ha, the curve is asymptotic. |
| 10:38:19 | 19 | So the bottom line is, Judge, his written report |
| 10:38:23 | 20 | has no basis whatsoever, based on the claim construction |
| 10:38:27 | 21 | provided by the Court as a matter of legal construction of |
| 10:38:30 | 22 | the patents, to give an opinion to the jury that there's |
| 10:38:37 | 23 | infringement based on asymptotic curvature.  And that's -- |
| 10:38:42 | 24 | I mean, that's our position on it. |
| 10:38:43 | 25 | THE COURT:  Okay. |

| | | |
|---|---|---|
| 10:38:46 | 1 | MR. LODHOLZ:  Let me see, make sure if I get any |
| 10:38:49 | 2 | other issues because we did have several other points. |
| 10:38:54 | 3 | There's an issue with Dr. Beckwith's methodology as far as |
| 10:39:03 | 4 | his explanation of the abrupt change in curvature, which |
| 10:39:07 | 5 | is a required element in several of the claims.  And just |
| 10:39:10 | 6 | to briefly explain that. |
| 10:39:13 | 7 | Your issue with that is, all he did was -- he |
| 10:39:16 | 8 | testified that all he did was look visually at the |
| 10:39:19 | 9 | curvature.  And when we asked him, you know, what would an |
| 10:39:24 | 10 | abrupt curvature be versus a not abrupt curvature, he |
| 10:39:29 | 11 | couldn't give an answer to say what an abrupt curvature |
| 10:39:32 | 12 | was.  I said, was it 90 degrees or something less?  And he |
| 10:39:34 | 13 | said, well, I don't really know.  It's just if it's |
| 10:39:36 | 14 | smooth. |
| 10:39:36 | 15 | So when I talked to him a little bit more about |
| 10:39:38 | 16 | that, I said, well -- you know, because he starts talking |
| 10:39:44 | 17 | about sine waves.  And a sine wave has the same function |
| 10:39:47 | 18 | on the positive part of the graph as it does on the |
| 10:39:50 | 19 | negative part.  And he talked about, well, if it's a sine |
| 10:39:52 | 20 | wave, it has the same curvature, the radius of curvature, |
| 10:39:55 | 21 | then he considers it not abrupt. |
| 10:39:58 | 22 | And he said where he would draw the line on that, |
| 10:40:00 | 23 | where he would have concerns is if the radius becomes |
| 10:40:04 | 24 | different.  And you look at the drawings, and clearly the |
| 10:40:07 | 25 | radius on the design has two different radii for those |

10:40:14   1   curvatures.  So he didn't -- other than looking at it and

10:40:18   2   just saying, oh, it's a smooth curve, he didn't actually

10:40:21   3   analyze any technical matter that would be able to support

10:40:23   4   his conclusion on that.

10:40:24   5          With respect to claims 27 and 28, he has a

10:40:30   6   similar issue.  He just looked at it and says, that's what

10:40:33   7   I would normally think.  And this kind of gets into our

10:40:36   8   issue with he didn't disclose everything because he says,

10:40:41   9   I -- you know, he clearly has a very impressive

10:40:43   10  engineering background and we're not disputing that.  But

10:40:46   11  what he lacks in his background is any experience, really

10:40:50   12  specifically, with end fittings other than this one other

10:40:54   13  case that he -- basically in his deposition, he starts

10:40:56   14  saying everything's based on that, and we don't have any

10:40:58   15  of the information from that case.

10:41:00   16         But claims 27 and 28 talk about positive and

10:41:04   17  negative forces, which, again, he says all he did was look

10:41:09   18  at it and then, he can just tell.  In particular, when

10:41:15   19  pressed on that, he said, well, oh, I guess, well, it

10:41:18   20  could be either one.  Right.  So, I mean, you could say,

10:41:21   21  well, maybe that's just cross-examination, you know, why

10:41:25   22  can't you just ask him which one it is.  And the issue we

10:41:28   23  have with it is, he doesn't give an explanation of the

10:41:33   24  circumstances where it would be one versus the other,

10:41:37   25  especially when he's relying on some unknown conversation

10:41:40   1   with somebody at Texas A & M and some conversation with --

10:41:44   2           THE COURT:  Well, that, in and of itself, would

10:41:45   3   be a problem.

10:41:48   4           MR. LODHOLZ:  Well, certainly there's some great

10:41:50   5   engineers at Texas A & M that would have something to say

10:41:53   6   about this, but if they did, we would like to know who so

10:41:56   7   we could go talk to him or have his notes from that

10:41:57   8   conversation, or something.  So on claims 27 and 28, we

10:42:03   9   have a similar issue.

10:42:07  10           We have an issue with his valuation analysis as

10:42:12  11   to the 80 percent of the end fitting and we talk about --

10:42:17  12           THE COURT:  Does that still matter with regard --

10:42:19  13   is that just with the 300?

10:42:22  14           MR. LODHOLZ:  I think that goes to the damages on

10:42:25  15   the 200 and the damages on their claims against the

10:42:28  16   plaintiff, Judge.

10:42:29  17           THE COURT:  Okay.

10:42:30  18           MR. LODHOLZ:  So just to briefly go over that, I

10:42:33  19   mean, we outlined this in a lot of detail in the brief,

10:42:37  20   but the essential part of that is, we talked to him about,

10:42:41  21   you know, what his expertise is in this area of product

10:42:46  22   valuation, and he did actually have some experience doing

10:42:50  23   that.  And so, we asked him, well, what types of things

10:42:53  24   would you normally look at to do a valuation of this

10:42:57  25   nature?  He would do market studies, talk to customers,

10:42:59  1  talk to consumers, the people selling the products.  He

10:43:03  2  gave a pretty good list there of what things he would

10:43:06  3  normally do.

10:43:08  4        And then, when we asked where all that

10:43:09  5  information was, he said he didn't do it in this case.

10:43:12  6  And when we asked why, he said he didn't have time.  So,

10:43:16  7  you know, that one's pretty straightforward.

10:43:23  8        The last issue we have is, he gave a very lengthy

10:43:26  9  opinion in the middle of his report on the Series 100 and

10:43:30  10  the Series 200 products practicing the 431 patent.  So to

10:43:36  11  break that down a little bit, that's the products designed

10:43:38  12  and sold by the defendants practicing the defendants'

10:43:44  13  patent.  And we asked him why that was in there, he

10:43:46  14  couldn't give a reason.  We asked him if that was in there

10:43:49  15  to show that our product infringed, and he said that

10:43:52  16  didn't make any sense, which it doesn't.

10:43:54  17        And he's -- his stated basis for his opinion is

10:43:59  18  to give expert testimony on whether defendants -- or

10:44:05  19  counterclaim defendant's product infringes the 431 patent.

10:44:09  20  And then, he's got this long detailed opinion about how

10:44:11  21  the Endurance -- or John Crane before Endurance products

10:44:18  22  practiced the 431 patent, and it's just not relevant to

10:44:22  23  anything.

10:44:22  24        THE COURT:  We'll take up relevance when we get

10:44:25  25  to trial.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:44:26 | 1  | MR. LODHOLZ: Okay. But, I mean, one of the                   |
| 10:44:29 | 2  | things we looked at, I mean, in terms of Rule 26, you        |
| 10:44:32 | 3  | know, the expert's required to give the basis of his         |
| 10:44:34 | 4  | opinions obviously, but he's also supposed to give the       |
| 10:44:38 | 5  | reason for his opinions. And not being able to give a        |
| 10:44:41 | 6  | reason, just saying, well, I just did it for whatever.       |
| 10:44:44 | 7  | THE COURT: We'll take that up if he -- if it's               |
| 10:44:48 | 8  | not relevant to what we're trying, it won't come in.         |
| 10:44:52 | 9  | MR. LODHOLZ: Well, that's the last, I guess,                 |
| 10:44:54 | 10 | objection we have to Dr. Beckwith under Daubert. So          |
| 10:44:57 | 11 | unless the Court has any questions.                          |
| 10:44:58 | 12 | THE COURT: I don't.                                          |
| 10:45:00 | 13 | MR. LODHOLZ: Thank you, Judge.                               |
| 10:45:01 | 14 | THE COURT: Yes, ma'am. Ms. Ainsworth.                        |
| 10:45:05 | 15 | MS. AINSWORTH: Yes, your Honor. May it please               |
| 10:45:07 | 16 | the Court.                                                   |
| 10:45:07 | 17 | So in response to the plaintiffs' motion, Dr.                |
| 10:45:12 | 18 | Beckwith is our technical expert on our counterclaim         |
| 10:45:16 | 19 | dealing with the 431 patent. And so, the first issue that    |
| 10:45:19 | 20 | they raise, and I think it's really their primary issue,     |
| 10:45:23 | 21 | is that he should not be able to testify because he didn't   |
| 10:45:27 | 22 | use the Court's final claim construction in his opinion.     |
| 10:45:32 | 23 | And in this case, the timing is kind of weird because        |
| 10:45:36 | 24 | under the original scheduling order, all of the experts      |
| 10:45:39 | 25 | did their reports before the claim construction came out.    |

10:45:42  1            So --

10:45:44  2            THE COURT:  Let me kind of cut to the chase here.

10:45:47  3  Did he ever -- did Dr. Beckwith ever proffer an opinion

10:45:52  4  that used the Court's construction?

10:45:54  5            MS. AINSWORTH:  The opinion that he proffered

10:45:56  6  used our proposed construction, which is actually narrower

10:46:01  7  than the Court's construction.  The Court broadened the

10:46:07  8  counterclaim plaintiff's constructions.

10:46:09  9            THE COURT:  But it was done before -- he had the

10:46:11  10  duty -- the timing of the expert reports was, he had to do

10:46:14  11  that before I construed the claims?

10:46:16  12            MS. AINSWORTH:  That's correct, your Honor.  So

10:46:18  13  he gave opinions using both parties' constructions.  The

10:46:23  14  construction that -- the counterclaim plaintiff, my

10:46:44  15  client's construction is here, and we had proposed that it

10:46:50  16  meant the transition surface is what you extrapolate from,

10:46:56  17  and that you extrapolate from the end point of the

10:46:59  18  transition surface.

10:47:00  19            The Court said and the final construction says

10:47:08  20  that you extrapolate from the transition surface, which is

10:47:12  21  what we had proposed.  The other side had proposed the

10:47:16  22  whole entire annulus.  The Court said no, that's not

10:47:19  23  correct.  But you can extrapolate from any point on that

10:47:26  24  transition surface.  So what's different in the original

10:47:32  25  proposed construction is the three words "of the end" are

10:47:39  1  taken out.

10:47:40  2          And the Court's -- the special master's report

10:47:44  3  which detail this said that the Court's construction --

10:47:50  4  that our construction was too limiting, that the Court's

10:47:52  5  construction is broader, and so, extrapolation can be from

10:47:57  6  any point along the transition curve.

10:48:01  7          THE COURT:  So your position would be if it

10:48:02  8  infringes under the proposal that you all gave, it would

10:48:06  9  -- it would infringe under a broader construction.

10:48:10  10         MS. AINSWORTH:  Yes, your Honor.  And our expert

10:48:11  11 was asked about that in his deposition, and I know the

10:48:14  12 deposition came later.  He did not amend his report, to

10:48:18  13 directly answer your question.  But it's our position that

10:48:23  14 if it infringed under our construction, then he didn't

10:48:27  15 need to amend his report because it infringes, therefore,

10:48:31  16 under the Court's construction.

10:48:32  17         Now, I think that the defendant -- the

10:48:35  18 counterclaim defendant's argument, though, went beyond

10:48:38  19 that in what they've just argued to you.  They're arguing

10:48:43  20 now the argument that was made in their summary judgment

10:48:47  21 motion that the Court should deny --

10:48:49  22         THE COURT:  I think so, too --

10:48:51  23         MS. AINSWORTH:  -- which is that once we had that

10:48:51  24 construction, then he's applying it wrong and his

10:48:53  25 infringement opinion is wrong, and all of that is fair

| | | |
|---|---|---|
| 10:48:56 | 1 | game at trial.  And they may be right.  We may be right. |
| 10:49:00 | 2 | But that doesn't go, I believe, to the gatekeeper function |
| 10:49:05 | 3 | and whether he did the work right.  It's just they don't |
| 10:49:09 | 4 | like his final opinion.  And I think that's an ultimate |
| 10:49:12 | 5 | fact issue, not the question on the Daubert motion. |
| 10:49:16 | 6 | THE COURT:  I agree with that.  Why don't you |
| 10:49:17 | 7 | move on to the other issues they raised. |
| 10:49:20 | 8 | MS. AINSWORTH:  Yes, your Honor. |
| 10:49:20 | 9 | So the second issue that they raised was his |
| 10:49:23 | 10 | opinion, and this is also claim construction related on |
| 10:49:26 | 11 | the continuous curvature of the end fitting.  So what Dr. |
| 10:49:32 | 12 | Beckwith said was, he analyzed the drawings of the |
| 10:49:43 | 13 | curvature.  And the claim language here is a little |
| 10:49:45 | 14 | different than what we were talking about in some of the |
| 10:49:47 | 15 | other motions where you're looking at the inside and |
| 10:49:50 | 16 | measuring compressive forces.  The claim language doesn't |
| 10:49:54 | 17 | speak to a measurable element.  It speaks to whether |
| 10:49:57 | 18 | there's a transition surface that comprises a continuous |
| 10:50:00 | 19 | function surface having no abrupt change in curvature. |
| 10:50:05 | 20 | So he looks at the claim language.  As he |
| 10:50:08 | 21 | explained in his deposition, this is something that was |
| 10:50:12 | 22 | physically or visually observable, and that's what he did. |
| 10:50:16 | 23 | He said physical testing was not necessary to do this. |
| 10:50:19 | 24 | THE COURT:  And so, the question is whether or |
| 10:50:21 | 25 | not -- what abrupt means. |

10:50:22  1          MS. AINSWORTH:  And that's not something that's

10:50:27  2  defined.

10:50:27  3          THE COURT:  Correct.

10:50:29  4          MS. AINSWORTH:  In the claim construction.

10:50:32  5          THE COURT:  I'm with you on this one, as well.

10:50:37  6          MS. AINSWORTH:  So shall I move on?

10:50:42  7          THE COURT:  Yes, ma'am.

10:50:43  8          MS. AINSWORTH:  They also complained about his

10:50:45  9  opinions regarding infringement of claims 27 and 28 of the

10:50:48  10  431 patent, and that's a limitation that says that the

10:50:52  11  wedge has to have a leading edge for distributing positive

10:50:57  12  forces and a trailing edge for distributing negative

10:51:00  13  forces.

10:51:00  14          So Dr. Beckwith based his opinion here that the

10:51:03  15  claims were met by -- on his personal experience, his

10:51:07  16  experience in the industry on what leading edges do and

10:51:12  17  what trailing edges do.  They complained that he didn't

10:51:14  18  use any testing, but this was not an element that needed

10:51:17  19  measurement.  It's not an element that's written that the

10:51:21  20  force on the leading edge has to be X amount higher than

10:51:24  21  the force on the trailing edge.  He relied on the sworn

10:51:29  22  testimony of the inventor, Mr. Rutledge, who is the

10:51:35  23  underlying plaintiff in the case, the counterclaim

10:51:39  24  defendant.

10:51:39  25          The plaintiffs' expert never disputes that this

10:51:41  1  limitation is met, anyway.  The experts agree on this

10:51:45  2  point, so there wasn't a lot of underlying contention.

10:51:50  3  But this is something that he based on his understanding

10:51:55  4  of the industry.

10:51:56  5          THE COURT:  I'm with you on this one, as well.

10:51:59  6          MS. AINSWORTH:  There was a question on the

10:52:02  7  relevance of his opinions on the Series 100 and 200.  In

10:52:09  8  our review, those opinions are relevant because --

10:52:13  9          THE COURT:  I'll take that up at trial.

10:52:15  10          MS. AINSWORTH:  And I believe that the last one

10:52:19  11  -- well, there were two more issues.  One was whether he

10:52:22  12  disclosed who he talked to at A & M.  But there was one

10:52:27  13  about his apportionment opinion.  He's the one that did

10:52:31  14  the technical basis for the apportionment, which was

10:52:36  15  partially relied upon by the other side.  And they did

10:52:40  16  complain that his apportionment -- they complained about

10:52:45  17  he didn't do enough in coming up with his apportionment.

10:52:48  18  He did a two-step apportionment.  First, the overall

10:52:53  19  percentage of the sucker rod attributable to the end

10:52:56  20  fitting, and then, the overall value of the end fitting

10:52:59  21  that's attributable to the 431 patent.

10:53:02  22          THE COURT:  Did he articulate in his report the

10:53:06  23  -- how he came up with 80 percent?

10:53:08  24          MS. AINSWORTH:  Yes, your Honor.  Those are in

10:53:09  25  paragraphs 384 to 389 of his report and he walks through

10:53:14  1  how he did it.  And the interesting thing about this is

10:53:17  2  that the other side actually adopted our -- his

10:53:24  3  methodology for both of the two apportionments was the

10:53:26  4  same.  They say his methodology is fine for the first

10:53:31  5  apportionment that they actually adopt, but then, it's

10:53:34  6  allegedly totally insufficient for his second step of the

10:53:38  7  apportionment.

10:53:39  8       So, I mean, we think that those -- those are

10:53:41  9  questions that are fair if they want to cross him on, but

10:53:44  10  they don't go to whether it's actually admissible.

10:53:49  11       THE COURT:  Is that it?

10:53:50  12       MS. AINSWORTH:  Yes, your Honor.

10:53:51  13       THE COURT:  I'm with you on that one, as well.

10:53:54  14       The next motion is --

10:53:56  15       MR. LODHOLZ:  Judge.

10:53:57  16       THE COURT:  Yes, sir.

10:53:58  17       MR. LODHOLZ:  Sorry to interrupt.  May I make one

10:54:00  18  brief point in reply on --

10:54:02  19       THE COURT:  Of course.  Uh-huh.

10:54:04  20       MR. LODHOLZ:  I just wanted to briefly address

10:54:08  21  the distinction that she was trying to make that the Court

10:54:13  22  found that the defense construction was too limiting as to

10:54:19  23  the where you draw the curvature extension because, I

10:54:24  24  think -- well, first of all, they used quotes around that

10:54:26  25  in their brief, but the report and recommendation doesn't

10:54:29   1   actually say that.

10:54:31   2          And the distinction is that the report and

10:54:35   3   recommendation says that the plaintiffs correctly contend

10:54:40   4   that extending a curvature requires extension based on

10:54:43   5   more than a single point.  So he's going to give an

10:54:50   6   opinion that there's infringement based on only the

10:54:52   7   extension of a single point.

10:54:55   8          So if you -- I mean, I'm trying to think of an

10:55:00   9   analogy like if there's a contract that requires four

10:55:06   10  obligations of a party, that would be like allowing an

10:55:09   11  expert to opine that there's a breach of a contract

10:55:11   12  because one of the obligations wasn't met.

10:55:16   13         If all four of those things -- well, that's

10:55:18   14  probably not a very good analogy.

10:55:19   15         THE COURT:  That was not a very good analogy --

10:55:21   16         MR. LODHOLZ:  That was not a very good analogy.

10:55:21   17  I'm trying to do it on the fly and --

10:55:23   18         THE COURT:  Because I actually think if you show

10:55:25   19  that one.

10:55:25   20         MR. LODHOLZ:  Right, it would be met.  Right.

10:55:27   21  But this is actually the opposite case.  So.

10:55:29   22         THE COURT:  As I understood what Ms. Ainsworth

10:55:31   23  said is, essentially by the removal of those words, they

10:55:38   24  relied on a proposed construction that said words A

10:55:43   25  through Z, and that when you remove the three words that

10:55:49  1   the special master did to come up with the construction,

10:55:52  2   those three words are actually a gating or limiting,

10:55:57  3   meaning the construction that the special master gave

10:55:59  4   would be broader.

10:56:01  5          And so, if their expert says you guys infringe,

10:56:07  6   you guys being the counter-defendant infringe under a more

10:56:12  7   -- under something that requires all four elements in your

10:56:19  8   hypothetical on the breach of contract, basically they

10:56:22  9   removed one of the four and said no, you only need to meet

10:56:25 10   these three, and their argument is, well, then, you still

10:56:29 11   breach because we said you needed to breach all four and

10:56:33 12   we met that.  The fact that the Court removed one of those

10:56:37 13   four doesn't mean we got it wrong as long as you still

10:56:41 14   meet the other three.  That's your analogy.

10:56:44 15          And I agree with Ms. Ainsworth that if their

10:56:49 16   expert, because of the kaddywumpus way this was done --

10:56:52 17   and I apologize for that, how y'all had to do the reports

10:56:56 18   and when we got the Markman construction and all that.  I

10:57:00 19   guess we're all having to deal with that and that's

10:57:03 20   unfortunate.

10:57:04 21          But if their expert did, which I think we had --

10:57:10 22   I had to do myself, which is our report is due, we don't

10:57:15 23   have a claim construction yet.  We know what we're going

10:57:18 24   to say, we know what you're saying, we're going to give

10:57:20 25   our report in the alternative.  And then, the claim

| | | |
|---|---|---|
| 10:57:25 | 1 | construction the Court gives is actually broader than what |
| 10:57:29 | 2 | the claim proposed -- their proposed claim construction |
| 10:57:33 | 3 | is, you guys are going to infringe then, assuming -- now |
| 10:57:36 | 4 | you're going to get to cross-examine on exactly those |
| 10:57:39 | 5 | points. |
| 10:57:40 | 6 | But I don't agree with you -- I don't agree with |
| 10:57:45 | 7 | you on the big argument that they didn't use the right |
| 10:57:50 | 8 | claim construction.  If you -- at trial, you'll have an |
| 10:57:55 | 9 | opportunity to cross-examine their expert, and your expert |
| 10:57:58 | 10 | will be able to say why you don't infringe under the |
| 10:58:01 | 11 | Court's construction.  But that's a different issue than |
| 10:58:04 | 12 | did they use the correct construction or not. |
| 10:58:08 | 13 | MR. LODHOLZ:  Well, and, again, my analogy was -- |
| 10:58:10 | 14 | as you referenced was backwards.  But when they took out |
| 10:58:15 | 15 | the word -- because what you're trying to do in this |
| 10:58:18 | 16 | element on the claim language is determine if |
| 10:58:21 | 17 | extrapolation of the transition curve of any of the |
| 10:58:24 | 18 | infinite number of points on the curve, if you extrapolate |
| 10:58:29 | 19 | any of those, will it cross the rod? |
| 10:58:33 | 20 | THE COURT:  Right. |
| 10:58:33 | 21 | MR. LODHOLZ:  So if they have a -- |
| 10:58:34 | 22 | THE COURT:  And so, does cross mean the same as |
| 10:58:36 | 23 | intersect? |
| 10:58:38 | 24 | MR. LODHOLZ:  Intersect.  Yeah. |
| 10:58:38 | 25 | THE COURT:  That was -- I want to make sure |

10:58:40 1   because that was the word.

10:58:42 2           MR. LODHOLZ:  Will it intersect the rod.  So if

10:58:44 3   the expert is relying on an analysis based on only the end

10:58:50 4   points, then he's ignoring all of the other infinite

10:58:53 5   number of points.  And that's the construction.  Relying

10:58:58 6   on only the end point extrapolation is the construction

10:59:01 7   the Court expressly rejected.

10:59:03 8           THE COURT:  Well, I don't know -- I guess we'll

10:59:05 9   just have to agree to disagree.  I don't see it the way

10:59:08 10  you see it.  I think the removal of those words doesn't

10:59:12 11  mean he rejected what they're doing.  I think it actually

10:59:17 12  broadens the ability to show infringement.

10:59:20 13          MR. LODHOLZ:  Well, but, I mean, in this case,

10:59:22 14  it's kind of like you're looking at it as a -- the way the

10:59:26 15  infringement analysis has to go is, if the curvature is

10:59:32 16  extrapolated, to infringe, it has to not intersect the

10:59:40 17  rod.  So it's kind of like a double negative situation.

10:59:42 18  And so, I mean, it's.

10:59:49 19          THE COURT:  Here's the bottom line.  I know, I

10:59:54 20  understand what -- I understand what I intended or what

10:59:59 21  the construction is.  When we get to trial, if I feel like

11:00:03 22  their expert is not -- is offering an opinion that's

11:00:08 23  inconsistent with -- if you feel at trial that he's --

11:00:13 24  that he is giving an opinion that is inconsistent with the

11:00:17 25  claim construction, I am very sympathetic with you that

11:00:23  1  that's something that you can't quarrel with or get

11:00:26  2  through at cross-examination in front of the jury.  I

11:00:29  3  mean, you're going to say that's not what the Court said,

11:00:31  4  and he's going to say, nuh-uh, it is.  I get that.

11:00:36  5       Once we get to trial, if you think that the

11:00:39  6  opinion he offers at trial is inconsistent with what is

11:00:46  7  required by the claim construction, then approach the

11:00:50  8  bench, and we'll take it up outside the jury's presence,

11:00:54  9  and I'll make sure that the answers that he's giving at

11:00:58  10  that time are consistent with what I believe the claim

11:01:01  11  construction should be.

11:01:03  12       I'm having a hard time dealing with this in kind

11:01:05  13  of the abstract right now at a Daubert motion.

11:01:09  14       MR. LODHOLZ:  And, you know, we quote the

11:01:11  15  language from his deposition where we asked him, you know,

11:01:14  16  what other points did you extrapolate from, and he said

11:01:18  17  only the end points.

11:01:20  18       THE COURT:  Well, when we get --

11:01:22  19       MR. LODHOLZ:  So he ignored all the other

11:01:23  20  infinite number of points and that's -- I mean, to take

11:01:26  21  out the --

11:01:26  22       THE COURT:  Counsel, you've won.  I mean, I'm

11:01:31  23  having -- I don't feel comfortable excluding it -- ruling

11:01:37  24  on it right now, but you've won.

11:01:41  25       If we get to trial and counsel asks him a

11:01:44  1  question and he gives an answer and you believe that that

11:01:48  2  answer -- if your argument is that his answer is not

11:01:55  3  cross-examination like you didn't do it right or you

11:01:57  4  didn't -- all this other stuff we talked about, if your

11:02:01  5  opinion -- if your opinion is that at trial, he's given an

11:02:06  6  answer or two that is inconsistent with my claim

11:02:10  7  construction, let me know, we'll take a break, I'll hear

11:02:15  8  -- we'll figure it out at that time in the context of what

11:02:18  9  the actual claim construction is and where I could hear

11:02:21  10  what he's actually saying.

11:02:23  11       I'm very sympathetic to why you want it out.  I

11:02:26  12  just -- because of the way this worked where y'all were

11:02:30  13  stuck with proposed claim constructions when you did the

11:02:34  14  reports, and what you did afterwards, and all that, it's

11:02:39  15  -- I really can't -- I just can't fix it retrospectively

11:02:42  16  at this point, but I'm aware of it.  I'm sympathetic with

11:02:45  17  it.  I didn't like it when I was at trial and someone was

11:02:48  18  doing something that I thought the Court ought to be

11:02:51  19  controlling and it was a cross-examination.  I get all

11:02:54  20  that.

11:02:54  21       So when we get to trial and I hear what they put

11:02:57  22  on, then we'll take it up, and I assure you, I will do my

11:03:02  23  very best to make sure that neither side gets to proffer

11:03:05  24  an opinion that isn't consistent with what the claims

11:03:09  25  construction is.

| | | |
|---|---|---|
| 11:03:10 | 1 | MR. LODHOLZ:  Thank you, Judge. |
| 11:03:11 | 2 | THE COURT:  Okay.  And finally, we have -- I'm |
| 11:03:14 | 3 | going to tell you in advance, I'm going to deny the |
| 11:03:19 | 4 | Daubert motion with respect to the damages opinions of -- |
| 11:03:25 | 5 | I don't know if it's defendant or counter-plaintiff, or |
| 11:03:29 | 6 | all that, however you want to be referred to, I'm going to |
| 11:03:31 | 7 | deny that Daubert motion.  But we do have to take up the |
| 11:03:35 | 8 | Daubert motion with respect to Dr. Crichlow.  Did I |
| 11:03:40 | 9 | pronounce that correct?  C-R-I-C-H-L-O-W. |
| 11:03:46 | 10 | MR. CARROLL:  Your Honor, may we confer?  Because |
| 11:03:48 | 11 | I think aspects of the motion are moot in light of the |
| 11:03:51 | 12 | earlier rulings. |
| 11:03:51 | 13 | THE COURT:  Sure.  Where are we at on this? |
| 11:04:28 | 14 | MR. HOLMAN:  Your Honor, John Holman again for |
| 11:04:30 | 15 | the plaintiffs. |
| 11:04:31 | 16 | What counsel was conferring about is that there |
| 11:04:33 | 17 | are certain aspects of this motion, of plaintiffs' motion |
| 11:04:36 | 18 | to exclude Dr. Crichlow with respect to his opinion on the |
| 11:04:42 | 19 | Series 300.  We do not wish to take this court's time, |
| 11:04:45 | 20 | given the rulings that have been granted today, with |
| 11:04:50 | 21 | respect to the Series 300.  So we would reserve our right |
| 11:04:53 | 22 | to -- |
| 11:04:53 | 23 | THE COURT:  Sure. |
| 11:04:54 | 24 | MR. HOLMAN:  -- readdress those, at a later |
| 11:04:56 | 25 | point, if those are put back on the table. |

| | | |
|---|---|---|
| 11:04:58 | 1 | THE COURT:  And let me make clear, what I said |
| 11:05:01 | 2 | just a few seconds ago goes to everybody.  I mean, if |
| 11:05:06 | 3 | someone thinks that an expert is putting on evidence that |
| 11:05:13 | 4 | wasn't in -- that wasn't fairly disclosed in his report or |
| 11:05:17 | 5 | wasn't disclosed because of the weird way y'all did the |
| 11:05:21 | 6 | reports and the way that allowed you to cross-examine them |
| 11:05:24 | 7 | at a depo, or if it's not in the Markman construction, you |
| 11:05:28 | 8 | know, just let me know.  And I'm very sensitive to this, I |
| 11:05:31 | 9 | understand what you're talking about, and I will take it |
| 11:05:32 | 10 | up at trial. |
| 11:05:33 | 11 | MR. HOLMAN:  Yes, your Honor. |
| 11:05:34 | 12 | THE COURT:  And so, I will say that Josh just |
| 11:05:39 | 13 | told me, I don't anticipate this case needing two weeks to |
| 11:05:42 | 14 | try, which is, I think, what someone -- we had originally |
| 11:05:46 | 15 | budgeted it.  My sense is, we could try this -- well, what |
| 11:05:51 | 16 | we're going to do -- I think hopefully you all know this. |
| 11:05:53 | 17 | I'm not surprising you is, you're going to do the -- your |
| 11:05:56 | 18 | voir dire either the Thursday or Friday before.  I think |
| 11:06:00 | 19 | we talked about that. |
| 11:06:02 | 20 | MR. HOLMAN:  Yes, your Honor. |
| 11:06:02 | 21 | THE COURT:  I don't want y'all's feelings to be |
| 11:06:04 | 22 | hurt, but I don't remember in every case who I've talked |
| 11:06:06 | 23 | about with what.  So we'll start Monday morning with |
| 11:06:11 | 24 | opening arguments.  And then, does the plaintiff have any |
| 11:06:16 | 25 | idea about how much time, how many hours you think you'll |

| | | |
|---|---|---|
| 11:06:20 | 1 | need? |
| 11:06:26 | 2 | MR. JOSEPH:  Just for our case? |
| 11:06:28 | 3 | THE COURT:  No.  Total.  I mean, your case, |
| 11:06:31 | 4 | defending their case, the whole bit. |
| 11:06:34 | 5 | MR. HOLMAN:  I think some aspects of that may |
| 11:06:36 | 6 | have changed today, based on some rulings. |
| 11:06:38 | 7 | THE COURT:  I would think so. |
| 11:06:39 | 8 | MR. HOLMAN:  To trim that down, but we had |
| 11:06:41 | 9 | originally talked about 15 to 18 hours per side. |
| 11:06:44 | 10 | THE COURT:  Okay.  Counsel. |
| 11:06:48 | 11 | MR. CARROLL:  Your Honor, I would estimate we |
| 11:06:49 | 12 | would take about 12 hours. |
| 11:06:51 | 13 | THE COURT:  I'm thinking about 12 hours, as well. |
| 11:06:54 | 14 | Now, let me explain to you how I see things.  I never |
| 11:07:01 | 15 | liked to have a time limit of whatever it was, eight |
| 11:07:04 | 16 | hours, 12, 15, whatever it was, where -- the reason I have |
| 11:07:09 | 17 | time limits is because I tried doing it without time |
| 11:07:12 | 18 | limits, and you guys drove me crazy because for -- I'll |
| 11:07:17 | 19 | use that example where you -- with the expert didn't do an |
| 11:07:23 | 20 | FEA deal, and you guys feel like you've gotta ask that 63 |
| 11:07:28 | 21 | times to make sure the jury heard it, as opposed to just |
| 11:07:31 | 22 | once.  That's why I have time limits. |
| 11:07:33 | 23 | So, in other words, if you guys -- if I feel -- |
| 11:07:39 | 24 | I'm going to say it's 12 hours, but here's the way I see |
| 11:07:41 | 25 | the world.  If I feel like both sides are being effective, |

| | |
|---|---|
| 11:07:48 | 1 |
| 11:07:52 | 2 |
| 11:07:55 | 3 |
| 11:07:59 | 4 |
| 11:08:02 | 5 |
| 11:08:06 | 6 |
| 11:08:09 | 7 |
| 11:08:14 | 8 |

1  moving, doing things well, and at the end of the trial --

2  I'll just pick on you.  I'll pick on you because it's

3  easier.  If at the end of the trial, you guys have been

4  expeditious, dealt with everything well, and you say,

5  look, I need 30 more minutes to get both my damage expert

6  and my invalidity expert on, I'm probably going to allow

7  that because I found I never had enough time when there

8  was an arbitrary time limit.

9         So that's not the point -- the point of the time

10  limits, from my perspective, is to encourage you all to

11  not be repetitive, to do things in a manner that was

12  expeditious, but just in a manner that kept the jury's

13  interest going.

14         And I will tell you all that if you all do that

15  and if at the end, someone needs more time to get

16  something done and I feel like you all have done a good

17  job -- and I don't want to hear someone whine, oh, we did

18  this so we could -- I mean, I get it.  I want you all both

19  to aim for 12 hours, but I get how things happen.  And so,

20  I want to give everyone a fair trial.  I'll give everyone

21  enough opportunity to put on all their witnesses.

22         I will tell you this, though, that if -- and this

23  is the way my friend, Robert Pitman, does it and I think

24  it's a good way.  If I feel like during the course of the

25  trial, you guys are not being efficient, I will let you

11:09:25  1  know not in a -- not because I'm angry but just to let you

11:09:31  2  know that it will be harder to persuade me to give you

11:09:34  3  more time if I'm signaling to you that I don't think

11:09:37  4  you're being efficient.

11:09:37  5          Now, I never know when to step in.  You guys are

11:09:42  6  the trial lawyers.  And I almost never -- so you know, I

11:09:48  7  almost never ask questions during a jury trial.  I may

11:09:52  8  say, Ms. White, I didn't understand your answer, I want to

11:09:55  9  make sure that it was understood.  It's extremely rare

11:09:58  10 that I ask a question because I figure if you didn't ask

11:10:01  11 it, it wasn't because you didn't know to ask it.  It was

11:10:04  12 because you might not want it asked.  So I don't join in.

11:10:08  13         I will -- I'll clarify things if I just want to

11:10:11  14 make sure the jury heard something.  But I will tell you

11:10:16  15 that -- I know I'm boring you, but let me give you an

11:10:22  16 example.  I had a trial where it was a bench trial and I

11:10:29  17 finally looked up and I realized for the past 45 minutes,

11:10:33  18 they had been handing a witness one e-mail at a time,

11:10:37  19 asking the witness if he had ever looked at it and he said

11:10:41  20 no.  And that went on, had gone on for 45 minutes.  I

11:10:46  21 stopped listening because I just couldn't take it.

11:10:48  22         But I finally realized 45 minutes had passed, so

11:10:53  23 I figured that was their 45 minutes and that was fine.

11:10:55  24 But I said how many more e-mails do you have?  And he said

11:10:58  25 23.  And I said, why don't you offer all 23 at once and

11:11:05  1  say, have you ever seen any of these?  And he said, no.

11:11:08  2  I'm good, going to do them one at a time, at which point,

11:11:13  3  his counsel -- co-counsel, who was sitting across the

11:11:16  4  courtroom, screamed at him, put them all in at once.

11:11:21  5        And at first, I thought, you know, maybe what

11:11:24  6  Jennifer -- Ms. Ainsworth probably might have said, he

11:11:28  7  might have thought that was inappropriate for the counsel

11:11:30  8  to say that, but then, I realized, I had wanted to scream

11:11:34  9  it, too, so I didn't say anything.  But I said, why don't

11:11:38 10  you put them all in at once.

11:11:42 11        So I tell you that story because you all are all,

11:11:45 12  just from this hearing, very good lawyers, but even some

11:11:48 13  very good lawyers do things that, as I'm sitting up here,

11:11:51 14  I can't figure out why it's taking so much time to do

11:11:54 15  something.

11:11:55 16        So if I say something to you all about needing to

11:12:00 17  be more efficient, I promise you, it will be because I'm

11:12:04 18  trying to help you all out.  I like doing this.  I'm not

11:12:08 19  trying to -- I'm not going to make you all try to settle.

11:12:13 20  I like trials.  I'm looking forward to this trial very

11:12:17 21  much.  But if I -- I could promise you, if I start feeling

11:12:21 22  like you all are not being efficient, then I guarantee you

11:12:27 23  that the jury will be thinking the same thing.

11:12:31 24        So I might -- if I say that you, it's to

11:12:33 25  encourage you all for the benefit of the jury and not

| | | |
|---|---|---|
| 11:12:37 | 1 | because I'm unhappy in any way.  So I think that's all the |
| 11:12:41 | 2 | lecturing you all probably need today. |
| 11:12:44 | 3 | Is there anything else I could take up for you? |
| 11:12:46 | 4 | MR. HOLMAN:  Your Honor -- |
| 11:12:46 | 5 | MR. CARROLL:  Your Honor, in the interest of |
| 11:12:47 | 6 | efficiency. |
| 11:12:48 | 7 | THE COURT:  Yes, sir. |
| 11:12:48 | 8 | MR. CARROLL:  Not to interrupt you, John.  My |
| 11:12:51 | 9 | apologies for that.  I'm not sure that we have a remaining |
| 11:12:54 | 10 | aspect of this motion to argue.  In particular, I think |
| 11:12:59 | 11 | Judge Albright has made it very clear that it's not in the |
| 11:13:01 | 12 | report, it's not coming in at trial.  And I don't believe |
| 11:13:03 | 13 | that -- and we could confer about this -- believe that Dr. |
| 11:13:07 | 14 | Crichlow is advancing an invalidity argument that wasn't |
| 11:13:11 | 15 | referenced in his 205-page report. |
| 11:13:14 | 16 | If you want to think about that, I'm more than |
| 11:13:16 | 17 | happy to work through that with you, but if it wasn't |
| 11:13:19 | 18 | there, it ain't coming in. |
| 11:13:20 | 19 | THE COURT:  That's correct. |
| 11:13:22 | 20 | MR. CARROLL:  If it was there, perhaps it's |
| 11:13:23 | 21 | coming in. |
| 11:13:23 | 22 | THE COURT:  Right. |
| 11:13:25 | 23 | MR. CARROLL:  So I think that's where we are.  If |
| 11:13:26 | 24 | that's the case, this may also be -- |
| 11:13:29 | 25 | MR. HOLMAN:  I think there's another aspect to |

11:13:31   1   this particular issue --

11:13:32   2          THE COURT:  Okay.  Yes, sir.

11:13:33   3          MR. HOLMAN:  -- that needs some attention and

11:13:35   4   this is my opposing counsel alluded to, Dr. Crichlow did

11:13:41   5   assert invalidity contentions with his report, and in

11:13:44   6   doing so, he provided some FEAs on some various products,

11:13:49   7   including the defendants' products, plaintiffs' products.

11:13:55   8   And then, there was an FEA performed on what they have

11:13:59   9   named TRC end fitting, okay?  And so, with that TRC end

11:14:04  10   fitting, they have graphical results and they have

11:14:06  11   numerical results.

11:14:07  12          The problem is that when Dr. Crichlow was deposed

11:14:12  13   on this, he couldn't -- he could not identify, he didn't

11:14:16  14   view any physical specimens, despite his report saying

11:14:19  15   that he collected physical specimens.  He never reviewed

11:14:22  16   any drawings of this alleged TRC end fitting.  He never

11:14:26  17   saw any photos of a TRC end fitting.  He couldn't

11:14:29  18   verify --

11:14:30  19          THE COURT:  I think what counsel was saying is

11:14:31  20   that if it's not in his report, are y'all not planning to

11:14:33  21   bring it up if it's not in his report?

11:14:35  22          MR. CARROLL:  I'm not sure exactly what counsel

11:14:38  23   is arguing.  I think what he's saying is that there were

11:14:41  24   inputs and other things that went on behind the scenes

11:14:45  25   that occurred before Dr. Crichlow ran the FEA on the TRC

11:14:52  1  end fitting.  We intend to introduce the FEA on the TRC

11:14:56  2  end fitting and present that FEA, which has been produced.

11:14:59  3  And we also made the underlying data available for

11:15:02  4  inspection in 2018.  We're going to advance that argument.

11:15:06  5          THE COURT:  Okay.

11:15:06  6          MR. CARROLL:  The other stuff, it's not on our

11:15:09  7  exhibit list and it's probably not something that we're

11:15:11  8  going to advance.

11:15:12  9          THE COURT:  Okay.

11:15:12  10          MR. HOLMAN:  With all due respect, your Honor,

11:15:14  11  the fact that it's not on the exhibit list is the exact

11:15:16  12  problem.  We don't know that this TRC end fitting actually

11:15:19  13  exists in any sort of physical realm.  We have numerical

11:15:23  14  modeling, but nobody has been identified that has ever

11:15:27  15  seen this TRC end fitting.  It's never been produced in

11:15:30  16  this case.  No drawings have been produced.  We don't know

11:15:32  17  if this thing exists.

11:15:35  18          And so, that's the problem here with this

11:15:38  19  particular FEA.  It's not that the FEA was performed

11:15:42  20  incorrectly.  We just don't have any evidence that the

11:15:44  21  product exists.

11:15:46  22          THE COURT:  Well, here's what I'm going to do on

11:15:49  23  that.  Again, they're going to call this gentleman at

11:15:56  24  trial, correct?

11:15:57  25          MR. CARROLL:  Yes, sir.

| | | |
|---|---|---|
| 11:15:58 | 1 | THE COURT:  I'm going to be listening when |
| 11:16:02 | 2 | they're putting him on.  If -- and I'm going to be |
| 11:16:06 | 3 | assuming if they raise the issue that you're concerned |
| 11:16:08 | 4 | about, they are going to ask him to explain what the basis |
| 11:16:14 | 5 | of it is.  If they haven't provided it to you, then I will |
| 11:16:22 | 6 | instruct the jury to disregard that testimony, but I'll |
| 11:16:28 | 7 | have to deal with that one at trial.  I don't see any way |
| 11:16:31 | 8 | I can -- I'll just have to have it in the context of |
| 11:16:35 | 9 | trial. |
| 11:16:35 | 10 | MR. HOLMAN:  Yes, your Honor. |
| 11:16:36 | 11 | Just to make a point on that, Mr. Crichlow was |
| 11:16:39 | 12 | asked those questions in his deposition.  He couldn't |
| 11:16:40 | 13 | identify who ran the test, who collected the specimen. |
| 11:16:42 | 14 | THE COURT:  Well, that sounds to me like |
| 11:16:44 | 15 | cross-examination.  But I'll hear -- but I will then have |
| 11:16:49 | 16 | heard what he said in direct and I'll know what he said in |
| 11:16:54 | 17 | direct, and I'll be able to better put in context whether |
| 11:17:00 | 18 | or not -- I just can't tell from this.  I can't tell in |
| 11:17:04 | 19 | this setting. |
| 11:17:08 | 20 | So is there anything else we can take up? |
| 11:17:10 | 21 | MR. HOLMAN:  With respect to that motion, your |
| 11:17:12 | 22 | Honor, no, sir. |
| 11:17:12 | 23 | THE COURT:  Anything else plaintiffs want to take |
| 11:17:15 | 24 | up? |
| 11:17:16 | 25 | MR. CARROLL:  Not from defendants, your Honor. |

| | | |
|---|---|---|
| 11:17:17 | 1 | MR. HOLMAN:  No, sir.  Nothing from plaintiffs. |
| 11:17:20 | 2 | THE COURT:  I think I have one more -- oh, yes. |
| 11:17:23 | 3 | This is the most important thing I can say to you.  We |
| 11:17:26 | 4 | have had some extraordinarily great and gifted lawyers try |
| 11:17:29 | 5 | cases in my court, and none of them have been able to do |
| 11:17:34 | 6 | exhibits in a way that hasn't made all of us want to kill |
| 11:17:38 | 7 | ourselves.  So I don't get involved in that, but I know |
| 11:17:45 | 8 | from my deputy clerk that it just -- it is the worst part |
| 11:17:48 | 9 | of the case. |
| 11:17:50 | 10 | So you all need to talk in advance.  I typically |
| 11:17:55 | 11 | don't do the deal where you exchange exhibits the night |
| 11:17:59 | 12 | before, whatever.  I'm talking much more of a situation |
| 11:18:01 | 13 | where we finish up at trial and our records are nowhere -- |
| 11:18:07 | 14 | have nothing to do with what was used.  There should be a |
| 11:18:11 | 15 | universe of documents -- I'll use the easy one -- the |
| 11:18:16 | 16 | patents that both of you should be able to agree it is |
| 11:18:18 | 17 | coming in and that will probably be used.  Before we start |
| 11:18:23 | 18 | trial, you all should have a list of those documents that |
| 11:18:28 | 19 | you know you're going to -- that plaintiffs' going to use, |
| 11:18:33 | 20 | defendants' going to use. |
| 11:18:35 | 21 | The problem I have had, over and over and over, |
| 11:18:37 | 22 | is that you refuse to not object to their stuff in advance |
| 11:18:42 | 23 | and they refuse to not object to your stuff, and then, |
| 11:18:45 | 24 | through the whole trial, he offers it and you say no |
| 11:18:49 | 25 | objection, and then, that drives me crazy only because |

| | | |
|---|---|---|
| 11:18:53 | 1 | it's so hard to deal with exhibits. |
| 11:18:55 | 2 | So unless you have a really good reason to object |
| 11:19:01 | 3 | to an exhibit, just agree to whatever you think is likely |
| 11:19:06 | 4 | to come in, get a master list of exhibits, you could use |
| 11:19:10 | 5 | them at trial, they will have already been admitted, and |
| 11:19:13 | 6 | you will only need to take up and go through and say, I'm |
| 11:19:17 | 7 | discussing Exhibit 1, we'll get it down.  What we're going |
| 11:19:21 | 8 | to do probably at the end of the day or first thing in the |
| 11:19:24 | 9 | morning is go through and make sure we have a record of |
| 11:19:25 | 10 | all the exhibits that have been used.  It's probably my |
| 11:19:28 | 11 | fault we've had such a problem. |
| 11:19:29 | 12 | But it is another mystery to me why there is any |
| 11:19:38 | 13 | issue over exhibits because I have yet to see an exhibit |
| 11:19:40 | 14 | that is ever even objected to, you know.  And so, I don't |
| 11:19:43 | 15 | know.  I don't understand why people have 27 exhibits that |
| 11:19:45 | 16 | the other side says no objection.  I mean, talk about |
| 11:19:48 | 17 | these things in advance, presume I'm going to let it in |
| 11:19:53 | 18 | unless there's a good reason why it shouldn't be let in. |
| 11:19:59 | 19 | Because you can object to it at trial then, I mean -- at |
| 11:20:02 | 20 | any rate. |
| 11:20:02 | 21 | So is there anything else? |
| 11:20:04 | 22 | MR. HOLMAN:  No, your Honor. |
| 11:20:05 | 23 | THE COURT:  I'm just trying to get you guys ready |
| 11:20:07 | 24 | for trial. |
| 11:20:08 | 25 | MS. AINSWORTH:  Could I ask procedurally on that |

11:20:10  1  particular point, when we have the pretrial conference in

11:20:15  2  about a month from now, are we going to be going through

11:20:18  3  the exhibits then?  Will the Court deal with or pre-admit

11:20:22  4  some of the exhibits?

11:20:22  5          THE COURT:  I will pre -- I would love to

11:20:25  6  pre-admit -- thank you for asking.  My sense is that you

11:20:27  7  should -- that the vast majority of exhibits should fall

11:20:31  8  in the pre -- in the agreed and pre-admitted deal.  If a

11:20:38  9  plaintiff has exhibits they know they want to use that

11:20:44  10  you're going to object to, we'll take those up at pretrial

11:20:48  11  and vice versa.

11:20:50  12          MS. AINSWORTH:  Thank you, your Honor.

11:20:51  13          THE COURT:  But it better be a really --

11:20:54  14  relevance is almost for sure not going to be an objection

11:20:56  15  I'm going to sustain to the admission of an exhibit.  It

11:21:01  16  will probably be much closer to a 403 standard, or

11:21:05  17  something, for it not to be admitted.  I mean, it's a

11:21:10  18  patent case.  I mean, you know, how sexy or scandalous can

11:21:17  19  the exhibit be?  And so, you know -- and this is all to

11:21:24  20  protect you guys.

11:21:25  21          I mean, when I finish the trial, I move on to

11:21:27  22  something else.  It doesn't -- I mean, if we don't have

11:21:30  23  the exhibits right, that doesn't affect me.  But I want to

11:21:34  24  get it right for you guys.

11:21:36  25          So anything else?

| 11:21:37 | 1 |           MR. HOLMAN:  No, your Honor. |
|---|---|---|

11:21:37    1            MR. HOLMAN:  No, your Honor.

11:21:38    2            MR. CARROLL:  No, sir.

11:21:38    3            THE COURT:  Okay.  I look forward to the

11:21:41    4    pretrial.  Let me say on the record, as I always do, I

11:21:46    5    hope you do talk settlement because I think settlements

11:21:50    6    are almost always better than -- I mean, I think they're

11:21:54    7    good things, but that's entirely up to you all.  If you

11:21:57    8    can't resolve this through settlement, then I look forward

11:22:00    9    to trying the case in the very near future.

11:22:04   10            So if you have any problems, as I've said before,

11:22:07   11    between now and then that you can't resolve, we are

11:22:12   12    literally a phone call away.  We have -- so far, I think

11:22:15   13    we've heard everything that's needed to be heard within 24

11:22:18   14    hours and I can get it resolved.  I just want to keep this

11:22:22   15    case on track for trial.

11:22:24   16            Probably give you 30 minutes per side for opening

11:22:29   17    arguments and closing arguments.  But I don't keep a -- I

11:22:32   18    mean, I'm not timing you.  I mean, I'm not sitting there

11:22:35   19    ready to -- I just -- I will tell you that no one should

11:22:39   20    go longer than 30 minutes just from having sat up here.

11:22:42   21    But I'm not sitting there with a watch, you know.

11:22:45   22            Now, if you get to 50 minutes, that will be too

11:22:49   23    long, and if I say, you really need to wrap this up, the

11:22:54   24    appropriate response is not, I just have five more

11:22:57   25    minutes.  If I have to tell you, you need to wrap it up,

11:23:00  1  it means you've gone way too long and you just need to sit

11:23:04  2  down.  I don't anticipate that, but it's happened.  And

11:23:09  3  so, I'm encouraging you only because I don't want to,

11:23:15  4  directly in front of the jury, just order you to sit down.

11:23:19  5  But when I encourage you to do things, it's usually a

11:23:21  6  really, really strong encouragement.

11:23:25  7          So if anything comes up between now and trial,

11:23:28  8  best of luck to you.

11:23:31  9          MR. HOLMAN:  Thank you, your Honor.

10          MR. CARROLL:  Thank you.

11          (End of proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         *  *  *  *  *  *

2

3

4   UNITED STATES DISTRICT COURT  )

5   WESTERN DISTRICT OF TEXAS)

6

7      I, LILY I. REZNIK, Certified Realtime Reporter,

8   Registered Merit Reporter, in my capacity as Official

9   Court Reporter of the United States District Court,

10  Western District of Texas, do certify that the foregoing

11  is a correct transcript from the record of proceedings in

12  the above-entitled matter.

13     I certify that the transcript fees and format comply

14  with those prescribed by the Court and Judicial Conference

15  of the United States.

16     WITNESS MY OFFICIAL HAND this the 25th day of February,

17  2020.

18

19

20                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
21                              Official Court Reporter
                                United States District Court
22                              Austin Division
                                501 W. 5th Street,
23                              Suite 4153
                                Austin, Texas 78701
24                              (512)391-8792
                                Certification No. 4481
25                              Expires:  1-31-21
```